**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

"DJ," A MINOR, BY AND THROUGH HIS NEXT
FRIEND AND MOTHER, ROBIN HUGHES, AND
HIS NEXT FRIEND AND FATHER, QUENTIN
JOHNSON,

        Plaintiff,

                                              Case No. 3:19-cv-00905-MHL

v.

                                              **JURY TRIAL DEMANDED**

SCHOOL BOARD OF HENRICO COUNTY,

THOMAS MCAULEY,

SCOTT BOWERS, and

JOHN DOES 1-3,

        Defendants.

## AMENDED COMPLAINT

COMES NOW "DJ," a minor, by and through his Next Friend and Mother, Robin Hughes, and his Next Friend and Father, Quentin Johnson, by counsel, and moves the Court for judgment against Defendants School Board of Henrico County (hereinafter "SBHC" or "School Board"), Thomas McAuley, Scott Bowers, and John Does 1-3 (all of the foregoing are collectively referred to herein as the "Defendants"); and in support of his Amended Complaint, states as follows:

## I.    INTRODUCTION

1.    On October 13, 2017, Plaintiff "DJ," a 12-year-old, African-American male middle-schooler, and two other African-American boys, were violently targeted and abused at Short Pump Middle School ("SPMS").  DJ and his fellow African-American football teammates were grabbed, forcibly held, and pushed, chest down, onto locker room benches and the floor by

larger white and other non-African-American football team members.  The African-American boys were then held down and forced to endure multiple sex acts simulated upon them by these peers.  All the while, and while surrounded by other white boys who were laughing and egging them on, the non-African-American boys battering and simulating sex acts on DJ and others yelled abusive, sexually, and racially charged statements.  These included, "hey [name of non-African-American child], what's up with you and the blacks?" and "he's fucking a black kid!" and "Hey I'm into that Asian on black stuff."  Using their cell phones, the non-African-American boys videotaped their dominant, violent actions.  One of the African-American boys can be seen on video screaming and crying out in pain.  The jeering and abuse continued undeterred.  When the African-American boys were eventually released, they quickly fled the violence and humiliation.  The non-African-American boys thereafter added demeaning, racially charged captions to the video they made, such as "we gonna fuck the black outta [sic] these African children from Uganda," "we like black children," and "we fuck every black child in the lockeroom [sic]," and posted the video on social media.

2.      The Defendant School Board, principal, and football coach, among other school officials, had been warned on multiple occasions, by multiple parents and others of racial hatred and violence directed by white / non-African-American SPMS football players against the three African-American members of the SPMS football team.  They had also been warned in writing by DJ's father that white players were threatening racial violence against his son and other African-American boys.  A week prior to the October 13 incident, a young African-American boy had been attacked by a white boy who yelled racial slurs, including "n-----," during the attack.  The Defendants had acknowledged the disturbing circumstances and had stated that the

team would be supervised at all times by an adult while in the locker room.  However, the Defendants failed to provide for this supervision.

3.      Following the violent, demeaning incident, DJ and his African-American teammates were subjected to persistent bullying and harassment from peers, which was both racial and sexual in nature. This would occur in the hallways of SPMS, in plain view of teachers and other SPMS staff.  One of the boys moved with his parents to another state.  DJ has been greatly affected by the circumstances.  He is not at all the same child that he once was.  The complete breadth of the humiliation and trauma that he has suffered will be fully delineated at trial.

## II.  __JURISDICTION__

4.      Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 1331, 1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims.

## III.  __VENUE__

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

6.      Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.  __PROCEDURAL HISTORY__

7.      On April 12, 2018, Plaintiff DJ provided notice to Defendant School Board.

8.      On October 15, 2019, Plaintiff, by and through his Next Friends and parents, timely filed a complaint in Circuit Court for the County of Henrico against the Defendants.

9. On December 5, 2019, Defendants School Board and McAuley removed the matter to U.S. District Court for the Eastern District of Virginia, Richmond Division. Although Plaintiff had filed an Amended Complaint in state court, in their Notice of Removal, the Defendants contended that the operative pleading was the Complaint. Accordingly, Plaintiff has termed this pleading as Plaintiff's "Amended Complaint."

10. On December 11, 2019, Defendants School Board and McAuley filed a motion to dismiss the Complaint. That motion has been supplanted by this Amended Complaint, which is filed as a matter of course pursuant to Federal Rule of Civil Procedure 15(a).

## V.    PARTIES

11. At all times relevant to this Amended Complaint, Plaintiff DJ, a then 12-year-old, now 14-year-old boy, was a resident of Henrico County, Virginia and was a student at SPMS and a member of the SPMS football team. Plaintiff DJ was also a student who was considered "special needs" and who qualified for, and was being educated with, an Individualized Education Plan (hereinafter "IEP") due to his severe attention deficit hyperactivity disorder (ADHD). Robin Hughes and Quentin Johnson are the mother and father, respectively, and Next Friends, of Plaintiff DJ.

12. At all times relevant to this Amended Complaint, Defendant SBHC directed and oversaw Henrico County Public Schools ("HCPS"), whose goal it was to "actively engage our students in diverse educational, social, and civic learning experiences that inspire and empower them to become contributing citizens." https://henricoschools.us/about/. At all relevant times, Defendant SBHC had the duty to ensure a safe, non-discriminatory, and inclusive educational and extracurricular environment for school-aged children, including DJ, and to provide those children with employee supervision that facilitated a safe, non-discriminatory, and inclusive

environment.  Furthermore, at all relevant times, the SBHC had overall responsibility for the

hiring, training, and supervision of its faculty and staff, including all individually named

defendants.

13.     At all times relevant to this Amended Complaint, Thomas McAuley was the

principal of SPMS in Henrico County, Virginia.  As principal, McAuley's duties included

ensuring that all students attending SPMS were afforded a safe, non-discriminatory, and

inclusive environment, and that students like Plaintiff DJ who had an IEP received a free and

appropriate public education (hereinafter "FAPE").  McAuley was also responsible for

supervising school personnel, including the individually named defendants.  McAuley was

further responsible for recommending the hiring of teachers and other school staff, and for

recommending the firing of teachers and other school staff who failed to comply with school

policies and the United States Constitution with regard to ensuring the safety and well-being of

the students at SPMS.[1]  McAuley further had the authority to take corrective action to end the

discrimination against DJ and other African-American students.  In addition, at all relevant times

hereto, Defendant McAuley was an employee, agent, and/or servant of Defendant School Board,

and was acting within the course and scope of his employment and/or agency with Defendant

School Board, and under color of state law.  Defendant McAuley is sued in his individual

---

[1]  Although a current principal job description is not currently posted, SBHC has posted online the following duties and responsibilities of a middle school assistant principal, which, upon information and belief, also comprise the duties of a principal: "**Monitors and administers discipline**; **works directly with the entire school community on disciplinary issues;** Works with the principal in the implementation of the curricular and extracurricular programs; **Supervises parts of school program as assigned, e.g. Exceptional Education, athletics**, special programs, etc.; Assists in development of master schedule as needed; Provides staff support by availability to attend county meetings such as staff development, the PTA County Council, the Lay Advisory Committee as needed; **Attends work daily and is engaged and on task; Observes and evaluates classroom teachers and support personnel**; and, Performs other duties as assigned." (Emphasis added).

capacity.

14.     At all times relevant to this Amended Complaint, Scott Bowers was an employee of the School Board and the football coach for SPMS in Henrico County, Virginia.  Bowers also had the authority to take corrective action to end the discrimination against DJ and other African-American students.  In addition, at relevant times hereto, Defendant Bowers was an employee, agent, and/or servant of Defendant School Board, and was acting within the course and scope of his employment and/or agency with Defendant School Board, and under color of state law. Defendant Bowers is sued in his individual capacity.

15.     At all times relevant to this Amended Complaint, John Does 1-3 were assistants, employees, coaches, and/or other persons responsible for supervising the SPMS football team players in the boys' locker room on October 13, 2017.  In addition, at all relevant times hereto, Defendants John Does 1-3 were employees, agents, and/or servants of Defendant School Board, and were acting within the course and scope of their employment and/or agency with Defendant School Board.

## VI.     FACTS

16.     Plaintiff DJ was a 12-year-old seventh grader at SPMS and a member of the SPMS football team at the time that the October 13, 2017 incident giving rise to this Amended Complaint occurred.

17.     Approximately one week before the incident giving rise to this Amended Complaint, SPMS officials, including Defendant Bowers, Defendant McAuley, and other unknown SPMS administrators were made aware of a racial incident involving bullying and harassment of the African-American members of the SPMS football team by at least one white football player in the locker room following a game.

18.     In connection with the incident, which occurred on or about October 4, 2017, a white player used a racial slur and derogatory language.  Upon information and belief, the white player yelled, among other things, "you n-----s need to run faster!"  The white player's comments were directed at DJ and his two other African-American teammates.  This racially charged harassment and bullying led to a physical altercation **in the locker room** involving the white player and one of DJ's African-American teammates.

19.     At the time of the foregoing incident, the students were on SPMS school property and still in the care of school officials, but no adult was present to supervise the middle school players in the locker room.

20.     By email dated October 5, 2017, Mr. Johnson (DJ's father) advised Defendant Bowers about the foregoing incident in the locker room involving the racial slur, bullying, harassment, and the subsequent physical altercation.

21.     DJ was not involved in the physical altercation, but had advised his father of the incident, as DJ was one of the three African-American players to whom the racial slurs and derogatory language had been directed.  The African-American players represented a minority of the team, with the majority comprised of white boys.

22.     Via email response on October 5, 2017, Defendant Bowers acknowledged that he had been made aware of the incident the night before.  According to a statement given to a reporter by the mother of another SPMS football player, she and certain other parents were told in person by "an assistant coach" about the fight that happened in the locker room.

23.     In his October 5 email response, Defendant Bowers further advised Mr. Johnson that he (Bowers) had taken action and that "[b]eing this happened on school grounds I have to

7

involve the school." Defendant Bowers advised Mr. Johnson that a meeting had been set up with the SPMS administration, including the principal, about the matter.

24.    During a subsequent meeting with the SPMS administration, it was agreed and determined that the SPMS football players were no longer allowed to be in the locker room without adult supervision.  Defendant Bowers told Mr. Johnson on the phone and in person that an administrator or a coach would be supervising the locker room at all times.

25.    However, eight days later, on October 13, 2017, the SPMS football players were once again left unsupervised after school in the boys' locker room for a significant period of time.  DJ was subject to the strictures of his adult supervisors, including that the players wear all equipment required to participate in tackle football.  That requirement – to dress in/out of tackle football equipment before and after games and practice – placed DJ and the two other African-American players in a vulnerable position in the unsupervised boys' locker room.

26.    As a result of the lack of adult supervision in the locker room, on October 13, 2017, Plaintiff DJ was the victim of racially and sexually charged bullying and harassment including a sexual assault and battery by two other players on the football team.

27.    While changing their clothes and preparing for football practice, DJ and two other African-American males on the team were grabbed, forced down, and held down against their wills by non-African-American players and subjected to demeaning and traumatizing simulated sex acts, bullying, harassment, racial slurs, ridiculing, and taunting.

28.    In one instance, DJ was grabbed and forced to bend over a bench seat while a bigger, stronger, non-African-American player held him down with a forearm to his neck and simulated performing anal sex on him.

29.     In another instance, DJ was forced over a bench while another non-African-American player simulated performing a sex act on him from behind.

30.     DJ was forced to endure racially derogatory and sexually abusive, insulting comments, such as, "hey [name of non-African-American child], what's up with you and the blacks?" ; "he's fucking a black kid!" and "Hey I'm into that Asian on black stuff."

31.     DJ did not consent to these unwanted acts or comments.  He struggled to be released but was overpowered by the other players.  DJ yelled and cried for the violent abuse to stop.  However, the devastating harassment, battery, laughter, and taunting by non-African-American boys continued.

32.     When he was finally released, DJ put his school clothes back on and went to the study hall classroom where he knew there was an adult present, and where he felt he would be safe from the actions of his teammates.

33.     DJ did not return to the locker room to retrieve his other school items until approximately an hour later.  He first waited to make sure that there were no players present in the locker room so that he would be safe.  Nor did he attend football practice that day.

34.     The football players involved in the sexual battery and assault videotaped the incident and posted it on social media, adding subtitles and voiceovers that included, among other things, "There has [sic] been two cases of rape in the short pump boy's lockeroom [sic] today," "**we gonna fuck the black outta [sic] these African children from Uganda**," "we fuck every black child in the lockeroom [sic]," and asking, "**ever wonder what happens in the football locker room.**"  (Emphasis added).  One comment indicated that a boy forcibly simulating sex acts "did not have a boner" during the battery, **"so that means I** [the boy simulating the sex acts] **don't actually have a thing for black people."**

35.     Hundreds of people saw the video on social media, including other students and the principal of a nearby school who contacted Defendant SPMS Principal McAuley to alert him about the video.

36.     The next school day following the October 13, 2017 incident, Plaintiff DJ was taunted, teased, and humiliated about being "raped" in the locker room by the students who committed the acts against him, as well as by other SPMS students who had seen the video.

37.     Following the October 13, 2017 attacks upon DJ and two other African-American boys, Defendant Bowers sought to minimize and/or dismiss the attacks as "foolishness" and a "joke" in statements made by the coach to the team.  Immediately following Bowers's remarks, DJ felt contempt in the stares of non-African-American players.

38.     Administrators at SPMS spoke to the boys on the football team about the incident on Monday, October 16, 2017.  The boys were told to keep what happened to themselves and not to tell anyone about the assault that had taken place that Friday.

39.     For several days after the October 13, 2017 incident, Plaintiff DJ continued to be subjected daily to students harassing him while pointing, laughing, and teasing him about the incident.  This harassment occurred in the halls of SPMS with regularity.  However, notwithstanding this open and public persecution, no action was taken by any member of the SPMS administration to address it.

40.     The school environment became so hostile and painful for DJ that his parents requested a waiver for him to attend another school in Henrico County where he could feel safe.

41.     Although DJ was eventually granted the waiver, his school environment was still uncomfortable, as students at his new school questioned him about the incident that they had also

seen on social media.  DJ, a "special needs" student with an IEP, had difficulty adjusting to his new school environment and routine.

42.     DJ continues to face increased psychological problems as a result of the discrimination, harassment, battery, assault and trauma he suffered at SPMS.  DJ's grades have suffered, he has increased anger, and he shows signs of antisocial behavior at times.  He must see a therapist regularly.

43.     The sexual battery and assault, discrimination on the basis of his race and gender, and the hostile and dangerous school environment to which he was subjected, as well as his sudden and subsequent school change, caused significant complications and disruptions to his learning environment.  This hostile environment effectively barred Plaintiff DJ from accessing educational opportunities and benefits at SPMS.

VII.    **KNOWLEDGE OF MCAULEY AND THE BOARD**

44.     A community meeting took place on October 25, 2017, at which the widespread nature of the discrimination and harassment at SPMS, and the knowledge of McAuley and the Board of this fact, was discussed at length.

45.     At that meeting, numerous parents stood to tell stories of racial, sexual, economic, and other forms of discrimination and harassment that their children had suffered while attending SPMS and other HCPS schools.  Those parents relayed that they had gone to Principal McAuley, the School Board, and other members of the administration at SPMS and other schools, but nothing had changed.

46.     Statements made by parents and students at the October 25, 2017 meeting included: "There is a systemic problem of racism and bullying at Short Pump Middle School that

is not being addressed"; "When black students are being bullied and sexually harassed, you do nothing"; and "These behaviors are pervasive."

47.     According to news reports on that meeting, during his time addressing the community at the meeting, Defendant McAuley confirmed that there had been previous incidents of discrimination and harassment at SPMS that, according to him, had been addressed.  No specifics were provided of how these issues purportedly were addressed.  Based on information and belief, it appears that while individual students involved in certain incidents may have been punished, no holistic or systemic changes were made, or even contemplated.  Indeed, simple measures such as ensuring adult supervision in the locker room were not effectively undertaken, much less widespread policy changes or resource enhancements at SPMS or HCPS as a whole to effectively deal with pervasive racism and bullying.

## VIII.  COUNTS

### COUNT I

### DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983

### (Against Defendant Bowers)

48.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

49.     Through his actions and omissions set forth above, and while acting under color of state law, and in his individual capacity, Defendant Bowers violated substantive due process rights to bodily integrity guaranteed to DJ by the Fourteenth Amendment to the United States Constitution.

50.     After the incident in the locker room on or about October 4, 2017, Defendant Bowers informed DJ's father Mr. Johnson that SPMS football team members would not be left unsupervised in the locker room again.

51.     This assurance caused DJ's parents not to take further action themselves to protect DJ.

52.     Defendant Bowers thus created the danger to Plaintiff DJ by failing to keep his promise to DJ's father—a promise that had induced DJ's parents into not taking steps of their own to ensure their child's safety.

53.     Defendant Bowers's failure to supervise the SPMS football team in the locker room—coupled with his assurances to Mr. Johnson that he, another coach, or an administrator would provide this supervision, which assurances caused DJ's parents not to act themselves—created an environment where Plaintiff DJ was left vulnerable to racial harassment and sexual battery and assault.

54.     Defendant Bowers's aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of DJ's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

55.     Defendant Bowers's violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorneys' fees, and costs to the Plaintiff.

**COUNT II**

**DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983
(DELIBERATE INDIFFERENCE – SUPERVISORY LIABILITY)**

**(Against Defendants McAuley and Bowers)**

56.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

57.     Through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants McAuley and Bowers acted in a manner that led to a violation of DJ's Fourteenth Amendment rights.

58.     Defendant McAuley had actual or constructive knowledge that his subordinates, Defendant Bowers and others, were engaged in conduct that posed a pervasive and unreasonable risk of injury to students such as DJ by leaving them unsupervised in the locker room.

59.     Defendant Bowers had actual or constructive knowledge that his subordinates (assistant coaches) were engaged in conduct that posed a pervasive and unreasonable risk of injury to students such as DJ by leaving them unsupervised in the locker room.

60.     Despite having this knowledge, Defendants McAuley and Bowers's responses were so inadequate as to exhibit their deliberate indifference to the dangers of that conduct and the risk to students such as DJ.

61.     There is an affirmative causal link between McAuley and Bowers's insufficient actions and the injuries suffered by DJ.

62.     Defendants McAuley and Bowers's aforesaid actions and omissions constitute willful, wanton, reckless, and conscious disregard of DJ's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

63.     Defendants McAuley and Bowers's violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorneys' fees, and costs to the Plaintiff.

## COUNT III

### DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF
### 42 U.S.C. § 2000d, *et seq.* (TITLE VI)
### (Against Defendant School Board)

64.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

65.     Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race in any educational program or activity receiving federal funding.

66.     Short Pump Middle School, where Plaintiff DJ was enrolled, receives federal funding, and received federal funding at all times relevant hereto.

67.     As described in the Amended Complaint, DJ suffered multiple instances of racial discrimination at the hands of other students.  As noted above, this racial discrimination had persisted at SPMS—and Henrico County Public Schools at large—for a lengthy period of time.

68.     The discrimination and harassment were so severe and objectively offensive so as to create a hostile environment and bar DJ's access to educational opportunities and benefits.

69.     Defendant School Board had actual knowledge of multiple acts of student-on-student racial discrimination.  Defendants McAuley and Bowers, who both possessed the power to take action to stop the discrimination against, and harassment of, DJ, had actual knowledge of the student-on-student harassment on the basis of race.

70.     Defendant School Board exhibited deliberate indifference in its reaction, or lack thereof, to the discrimination.  As demonstrated at the community meeting held after the assault in the locker room, parents and other community members had repeatedly informed Principal McAuley and/or the School Board of the racial discrimination (and other forms of discrimination) ongoing at SPMS and other HCPS schools.

71.     The choice by the School Board to take no action in the face of the ongoing discrimination and harassment taking place at SPMS and other HCPS schools was an intentional one.

72.     Principal McAuley and the School Board were aware of the racially-motivated fight in the locker room at SPMS on or about October 4, 2017.  They were aware of previous racist (and otherwise discriminatory) incidents as attested to by multiple parents and community members at the meeting held at SPMS on October 25, 2017.  Despite that awareness, the School Board consciously chose not to remedy the situation. The School Board affirmatively chose to take no ameliorative actions.  That constitutes intentional discrimination under Title VI.

73.     As a direct and proximate result of the School Board's conduct, DJ was injured  in various respects, including, without limitation, suffering severe psychological distress, humiliation, fear for his safety, and physical battery at SPMS, attributable to the School Board's deliberate indifference to the racial discrimination perpetrated against DJ and other vulnerable students.

74.     Defendant School Board's violations of Title VI of the Civil Rights Act of 1964 establish a cause of action, recognized by the Supreme Court in *Cannon v. University of Chicago*, for monetary relief consisting of compensatory damages, attorneys' fees, and costs to the Plaintiff.

16

## COUNT IV

### DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF
### 20 U.S.C. § 1681 (TITLE IX)

### (Against Defendant School Board)

75.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

76.     Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in any educational program or activity receiving federal funding.

77.     Short Pump Middle School, where DJ was enrolled, receives federal funding, and received federal funding at all times relevant hereto.

78.     As described in the Amended Complaint, DJ suffered discrimination in the form of a sexual assault.  That discrimination continued in the form of pervasive bullying and harassment of Plaintiff DJ by other students in the days, weeks, and months after the assault.

79.     The discrimination and harassment were so severe and objectively offensive so as to create a hostile environment and bar DJ's access to educational opportunities and benefits.

80.     Defendant School Board had actual knowledge of the student-on-student sexual harassment.  Defendants McAuley and Bowers, who both possessed the power to take action to stop the discrimination against, and harassment of, DJ, had actual knowledge of the student-on-student sexual harassment.

81.     Defendant School Board exhibited deliberate indifference in its reaction, or lack thereof, to the sexual harassment.

82.     As a direct and proximate result of the School Board's conduct, DJ was injured  in various respects, including, without limitation, suffering severe psychological distress,

humiliation, and fear for his safety at SPMS, attributable to the School Board's deliberate indifference to the discrimination perpetrated against DJ in violation of 20 U.S.C. § 1681.

83.     Defendant School Board's violations of Title IX of the Education Amendments of 1972 establish a cause of action, recognized by the Supreme Court in *Davis v. Monroe County Board of Education*, for monetary relief consisting of compensatory damages, attorneys' fees, and costs to the Plaintiff.

## COUNT V

### DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF 29 U.S.C. § 794 (§ 504 OF THE VOCATIONAL REHABILITATION ACT)

#### (Against Defendant School Board)

84.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

85.     The Vocational Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in any program or activity receiving federal funding.

86.     Short Pump Middle School, where DJ was enrolled, receives federal funding, and received federal funding at all times relevant hereto.

87.     As described in the Amended Complaint, DJ has a disability as defined by the Vocational Rehabilitation Act, because his mental impairment substantially limits his major life activities, including learning.  At all relevant times, DJ was thus considered a "special needs" student who qualified for, and was being educated with, an IEP.

88.     As described in the Amended Complaint, DJ suffered discrimination on the basis of his disability.

89.     The discrimination and harassment were so severe and objectively offensive so as to create a hostile environment and bar DJ's access to educational opportunities and benefits.

The discrimination and bullying violated DJ's right to a FAPE. Among other things delineated herein, the stress placed on DJ as a special needs student in an environment of continued harassment after the October 13 trauma caused his grades to drop and caused psychological and emotional problems that interfered with DJ's public education, such as increased anger and signs of antisocial behavior.

90.     Defendant School Board had actual knowledge of the student-on-student harassment that was interfering with DJ's right to a FAPE.

91.     Defendant School Board exhibited deliberate indifference in its reaction, or lack thereof, to the harassment.

92.     As a direct and proximate result of the School Board's conduct, DJ was injured in various respects, including, without limitation, suffering severe psychological distress, humiliation, and fear for his safety at SPMS, attributable to the School Board's deliberate indifference to the discrimination perpetrated against DJ in violation of 29 U.S.C. § 794.

93.     Defendant School Board's violations of the Vocational Rehabilitation Act of 1973 establish a cause of action, pursuant to 29 U.S.C. § 794a, for monetary relief consisting of compensatory damages, attorneys' fees, and costs to the Plaintiff.

## COUNT VI

### GROSS NEGLIGENCE

#### (Against Defendants McAuley, Bowers, and John Does 1-3)

94.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

95.     Defendants McAuley, Bowers, and John Does 1-3 (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care

with regard to DJ and other SPMS children, including members of the middle school football team; however, the Foregoing Defendants breached these duties.

96.     Defendants McAuley, Bowers, and John Does 1-3 were aware of harassment and bullying on the basis of race and sex occurring in the locker room for the SPMS football team.

97.     On at least one occasion, this harassment and bullying had led to a physical altercation between an African-American member of the team and at least one white player.

98.     Via email correspondence dated October 5, 2017, Defendant Bowers acknowledged that he was aware of this problem and he claimed that he had taken action.

99.     According to Defendant Bowers, a meeting took place with the SPMS administration at which it was agreed that SPMS football players would no longer be left alone and without adult supervision in the locker room.

100.     Despite this agreement supposedly reached during the meeting, eight days later, on October 13, 2017, the SPMS football players were left unsupervised in the boys' locker room for an extended period of time.

101.     As a result of that lack of supervision, Plaintiff DJ was the victim of bullying and harassment which resulted in a racially charged sexual battery and assault by two other players on the team.

102.     While changing their clothes and preparing for football practice, Plaintiff DJ and two other African-American males on the team where grabbed, pushed, and held down against their wills by non-African-American players and were subjected to demeaning and traumatizing simulated sex acts, bullying, harassment, racial slurs, ridiculing, and taunting.  SPMS football players simulated performing sex acts on Plaintiff DJ while forcibly holding him down and pushing him over a bench.

103.    When he was finally released, Plaintiff DJ put his school clothes back on and went to the study hall classroom where he knew there was an adult present, and where he felt he would be safe from the actions of his teammates.  He did not return to the locker room, nor did he attend practice that day.

104.    The players involved in the sexual battery and assault videotaped the incident and posted it on a social media site, adding subtitles and voiceovers that included "we gonna fuck the black outta [sic] these African children from Uganda," "we like black children," and "we fuck every black child in the lockeroom [sic]."

105.    The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Amended Complaint, showed such a level of indifference to DJ and the other African-American members of the SPMS football team so as to constitute an utter disregard of prudence, amounting to a complete neglect for DJ's safety.  Additionally, as noted above, the several acts of negligence of *each* of the Defendants *individually* (as opposed to the group as a whole), when combined, had a cumulative effect showing a reckless or total disregard of DJ.

106.    As a direct and proximate cause of the gross negligence of the Foregoing Defendants, DJ has suffered great physical pain, and mental anguish, and has and/or will incur hospital, doctors', and related bills, and has incurred other costs and expenses.

107.    The Foregoing Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT VII

### WILLFUL AND WANTON NEGLIGENCE

### (Against Defendants McAuley, Bowers, and John Does 1-3)

108.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

109.    Defendants McAuley, Bowers, and John Does 1-3 (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to DJ and other SPMS children, including members of the middle school football team; however, the Foregoing Defendants breached these duties.

110.    Defendants McAuley, Bowers, and John Does 1-3 were aware of harassment and bullying on the basis of race and sex occurring in the locker room for the SPMS football team.

111.    On at least one occasion, this harassment led to a physical altercation between another African-American member of the team and at least one white player.

112.    Via email correspondence dated October 5, 2017, Defendant Bowers acknowledged that he was aware of this problem and he claimed he had taken action.

113.    According to Defendant Bowers, a meeting took place with the administration at which it was agreed that SPMS football players would no longer be left alone and without adult supervision in the locker room.

114.    Despite this agreement supposedly reached during the foregoing meeting, eight days later, on October 13, 2017, the SPMS football players were left unsupervised in the boys' locker room for an extended period of time.

115.    As a result of that lack of supervision, Plaintiff DJ was the victim of bullying and harassment which resulted in a sexual battery and assault by two other players on the team.

116.     While changing their clothes and preparing for football practice, Plaintiff DJ and two other African-American males on the team where held down against their wills by non-African-American players and subjected to demeaning simulated sex acts, bullying, harassment, racial slurs, ridiculing, and taunting.  SPMS football players simulated performing sex acts on Plaintiff DJ while holding him down and forcing him over a bench.

117.     After he was released, Plaintiff DJ put his school clothes back on and went to the study hall classroom where he knew there was an adult present, and where he felt he would be safe from the actions of his teammates.  He did not return to the locker room, nor did he attend practice that day.

118.     The players involved in the sexual battery and assault videotaped the incident and posted it on a social media site, adding subtitles and voiceovers that included "we gonna fuck the black outta [sic] these African children from Uganda," "we like black children," and "we fuck every black child in the lockerroom [sic]."

119.     The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Amended Complaint, consciously in disregard to DJ's rights.  In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Amended Complaint, with a reckless indifference to the consequences to DJ when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to DJ.

120.     The Foregoing Defendants' willful and wanton negligence establish causes of action for monetary relief consisting of compensatory damages and punitive damages, and costs to the Plaintiff.

## VIII.   <u>JURY TRIAL DEMANDED</u>

121.   Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## IX.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of the Defendants, specifically, Defendants School Board of Henrico County, Thomas McAuley, Scott Bowers, ,and John Does 1-3, jointly and severally, in the amount of $15 million ($15,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, $350,000.00 in punitive damages against Defendants McAuley, Bowers, and John Does 1-3 for the state law willful and wanton negligence claims, attorneys' fees (in connection with applicable federal claims), and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

"DJ," A MINOR, BY AND THROUGH HIS
NEXT FRIEND AND MOTHER, ROBIN
HUGHES, AND HIS NEXT
FRIEND AND FATHER, QUENTIN JOHNSON,


By:   _____/s/ Charlotte P. Hodges__
Counsel

Charlotte P. Hodges (VSB# 41547)
B.I.G. LEGAL SERVICES, PLLC
P.O. Box 4302
Midlothian, VA 23112
Phone: (804) 475-5484
Fax:    (804) 482-2479
Email:  biglegal10@verizon.net


*Counsel for Plaintiff*

Mark J. Krudys (VSB# 30718)
Daniel Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email:mkrudys@krudys.com;
       dzemel@krudys.com

**<ins>Certificate of Service</ins>**

I hereby certify that on this 24th day of December 2019, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send

notification of such filing to the following:

>John D. Gilbody, Assistant County Attorney
>Ryan P. Murphy, Assistant County Attorney
>Joseph P. Rapisarda, Jr., County Attorney
>County of Henrico, Office of the County Attorney
>P.O. Box 90775
>Henrico, VA  23273-0775
>gil077@henrico.us
>mur047@henrico.us
>rap@henrico.us

>By:   /s/ Charlotte P. Hodges
>         Counsel

>Charlotte P. Hodges (VSB# 41547)
>B.I.G. LEGAL SERVICES, PLLC
>P.O. Box 4302
>Midlothian, VA 23112
>Phone: (804) 475-5484
>Fax:    (804) 482-2479
>Email:  biglegal10@verizon.net

>*Counsel for Plaintiff*

25