**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

"DJ," A MINOR, BY AND THROUGH HIS NEXT FRIEND
AND MOTHER, ROBIN HUGHES, AND HIS NEXT FRIEND
AND FATHER, QUENTIN JOHNSON,

      Plaintiff,

                                    Case No. 3:19-cv-00905-MHL

v.

SCHOOL BOARD OF HENRICO COUNTY, *et al.,*

      Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS SCHOOL BOARD OF HENRICO COUNTY,
MCAULEY, AND BOWERS'S MOTION TO DISMISS**

COMES NOW Plaintiff DJ, a minor, by and through his next friend and mother, Robin

Hughes, and his next friend and father, Quentin Johnson, by counsel, and for his Memorandum

in Opposition to Defendants School Board of Henrico County ("School Board" or "Board"),

Thomas McAuley, and Scott Bowers's Motion to Dismiss, states:

Defendants seek to dismiss, under Federal Rule of Civil Procedure 12(b)(6), the federal

civil rights claims against them for deprivation of the substantive due process right to bodily

integrity, supervisory liability, discrimination on the basis of race and sex, and denial of DJ's

right to a free and appropriate public education, as well as the state law claims for negligence.

Contrary to the Defendants' assertions, the Amended Complaint contains facts sufficient

to "plausibly" establish claims upon which relief may be granted. *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009). Throughout their memorandum in support of their motion to dismiss, the

Defendants in multiple instances attempt to hold the Plaintiff's Amended Complaint to the

standards required at the Motion for Summary Judgment stage. Many, if not the vast majority, of

the elements for the claims brought in the Amended Complaint are questions of fact. As such, the

Defendants face a high bar in attempting to dismiss those claims before any discovery has been taken. They cannot meet it. The Plaintiff's detailed Amended Complaint provides sufficient facts and allows for reasonable inferences to be drawn that, at this stage, state claims for sex, race, and disability-based discrimination, violations of the Due Process Clause, and negligence.

## FACTUAL AND PROCEDURAL HISTORY

The Amended Complaint asserts that Plaintiff "DJ," a 12-year-old, African-American male middle-schooler, and two other African-American boys, were assaulted by non-African-American peers in the locker room of Short Pump Middle School ("SPMS") on October 13, 2017. ¶ 1.[1] DJ and his African-American counterparts, all members of the school football team, were forcibly held down on the floor and the locker room benches by larger white and other non-African-American football team members. They were forced to endure multiple sex acts brutally simulated upon them by their peers, while the remaining members of the football team were egging on this abuse and yelling sexually and racially charged statements. *Id.* Using their cell phones, the non-African-American boys videotaped their dominant, violent actions. *Id*. One of the African-American boys can be seen on video screaming and crying out in pain. *Id*. The non-African-American boys thereafter added demeaning, racially charged captions to the video they made, such as "we gonna fuck the black outta [sic] these African children from Uganda," "we like black children," and "we fuck every black child in the lockeroom [sic]," and posted the video on social media. *Id*.

As the Amended Complaint asserts, this assault was not the first targeting African-American players in the SPMS locker room. ¶ 2. About a week prior to the October 13 assault, a non-African-American football team member yelled racial slurs, including "n----r," at the

---

[1] Unless otherwise noted, all paragraph citations are to the Amended Complaint, ECF No. 7.

African-American team members. *Id*. The hurling of slurs led to a physical altercation in the locker room between the player yelling the slurs and one of DJ's African-American teammates. ¶ 18. At the time of these events, the boys were unsupervised in the locker room. ¶ 19.  The day after this altercation, October 5, 2017, Mr. Johnson (DJ's father) sent an email to Defendant Bowers advising him of what had happened in the locker room. ¶ 20. Defendant Bowers responded that he had been made aware of the incident the night after it happened. ¶ 22. According to a statement given to a reporter by the mother of another SPMS football player, she and certain other parents were told in person by "an assistant coach" about the fight that happened in the locker room. *Id*. Mr. Johnson had received no such in-person update.

In his October 5 email, Bowers told Mr. Johnson, "[b]eing this happened on school grounds I have to involve the school" and that a meeting had been set up with the SPMS administration, including McAuley. ¶ 23. During that meeting, it was agreed and determined that SPMS football players would not be allowed to be in the locker room without adult supervision. ¶ 24. **Bowers confirmed with Mr. Johnson both on the phone and in person that an administrator or a coach would be supervising the boys in the locker room at all times.** *Id*.

Despite those assurances—and as asserted in the Amended Complaint—the SPMS football players were left unsupervised in the locker room a mere eight days later (if not before as well). ¶ 25. DJ and his fellow African-American teammates were subjected to a degrading and public, racially charged assault and battery. ¶ 26. Amid racist jeering, DJ was held down with a forearm to his neck while a non-African-American player simulated performing anal sex on him. ¶¶ 28, 30. Another non-African-American player then forced DJ over a bench while thrusting behind him. ¶ 29. DJ cried and struggled to be released, but the stronger players overpowered him. ¶ 31. Once finally released, DJ put his school clothes back on and rushed to study hall

where he knew an adult would be present. ¶ 32. He only returned to the locker room to retrieve his remaining possessions after he knew that the other players would be gone. ¶ 33.

The videos posted on social media were seen by hundreds of people, including other SPMS students and the principal of a nearby school. ¶ 35. That principal is the one who informed Defendant McAuley about the existence of the video. *Id.* The next school day after the assault on October 13, Plaintiff DJ was taunted, teased, and humiliated about being "raped" in the locker room by the students who committed the acts against him, as well as by other SPMS students who had seen the video. ¶¶ 36, 37. As asserted in the Amended Complaint, following the October 13, 2017 attacks upon DJ and two other African-American boys, Defendant Bowers sought to minimize and/or dismiss the attacks as "foolishness" and a "joke" in statements he made to the team—further excluding DJ. ¶ 37. That same day, Monday, October 16, SPMS administrators told members of the football team not tell anyone else about the assault. ¶ 38.

In the days after the October 13 assault, DJ continued to face daily abuse in the form of other students pointing at him, laughing at him, and teasing him about the contents of the video. ¶ 39. This harassment occurred in the halls of SPMS in the open, but no action was taken by SPMS administrators. *Id.* The school environment became so hostile and painful for DJ that his parents requested a waiver for him to attend another school in Henrico County where he could feel safe. ¶ 40. Despite the eventual granting of the waiver, DJ continued to feel uncomfortable at school as his new peers had also seen the video and continued to taunt and harass him. ¶ 41. DJ continues to face increased psychological problems as a result of the discrimination, harassment, battery, and assault he suffered at SPMS. ¶ 42. DJ's grades have suffered, he has increased anger, and he shows signs of antisocial behavior. *Id.* He must see a therapist regularly and continues to suffer the negative effects of the trauma he endured at SPMS. *Id.*

Plaintiff, by and through his Next Friends and parents, timely filed suit in the Circuit Court for the County of Henrico on October 15, 2019. ¶ 8. On December 5, 2019, Defendants School Board and McAuley removed the case to federal court. ¶ 9. On December 11, 2019, those same defendants filed a motion to dismiss. ¶ 10. On December 24, 2019, Plaintiff filed an Amended Complaint as a matter of right. ECF No. 12. Defendants filed this current motion to dismiss on January 17, 2020. ECF No. 14.

## ARGUMENT

### I.     Standard of Review

To satisfy Federal Rule of Civil Procedure 8(a)(2), a complaint simply must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). A Rule 12(b)(6) motion tests the legal sufficiency of a complaint; it does not "resolve contests surrounding the facts, the merits of a claim, or applicability of defenses." *Morey v. Carroll Cty.*, No. ELH-17-2250, 2018 U.S. Dist. LEXIS 74847, at *11 (D. Md. May 3, 2018) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter…to state a claim to relief that is plausible on its face." *Acorn Land, LLC v. Balt. County*, 402 Fed. Appx. 809, 816 (4th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff need merely provide "'enough factual matter (taken as true) to suggest' a cognizable cause of action." *Morey*, 2018 U.S. Dist. LEXIS 74847, at *11 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### II.    Plaintiff States Claims Under Both Title VI and IX

Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.  Similarly, Title IX of the Education

5

Amendments of 1972 commands that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As the legal standards for deliberate indifference to student-on-student harassment claims under Title VI and Title IX are identical, they will be discussed simultaneously. *See Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 649 (1999); *M.D. v. Sch. Bd.*, 560 Fed. Appx. 199, 203-04 (4th Cir. 2014) (analyzing a Title VI claim utilizing the *Davis* standard); Br. at 16 ("the deliberate indifference standard under Title VI and Title IX is the same").

In the Fourth Circuit, Title VI and IX claims for harassment contain the following four elements: "(1) [P]laintiff was a student at an educational institution receiving federal funds; (2) [Plaintiff] was subjected to harassment based on [his/her] sex [or race]; (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). Defendants do not contest that Plaintiff has met the first two elements, nor could they. However, they argue that the third and fourth prongs have not been satisfactorily pled.

As to the third prong, the creation of an abusive environment, the Defendants argue that "[a]lthough the Plaintiff has alleged harm, he has failed to connect this harm to the denial of an educational benefit." Br. at 20. The hostile and dangerous school environment to which DJ was subjected constitutes an abusive environment, as Defendants appear to concede. For several days after the October 13, 2017 incident, Plaintiff DJ continued to be subjected daily to students harassing him while pointing, laughing, and teasing him about the incident. DJ's grades suffered. The abusive environment at SPMS was unabating and DJ was forced to change schools, causing significant complications and disruptions to his learning environment.

6

Lastly, in support of their argument that Plaintiff has not pled sufficient facts to impute liability to the Board, Defendants contend both that the only notice the School Board had of harassment pertained to the October 13th assault and that the minimal activities undertaken by the School Board in response to that assault were enough to elevate their mental state above deliberate indifference. Neither contention holds water.

### A.      DJ was Denied an Educational Benefit

Defendants do not attempt to argue that the assault suffered by DJ was not sufficiently severe. However, Defendants do argue that the harm DJ suffered from the assault is not connected to "the denial of an educational benefit." Br. at 20. Defendants quote the Fourth Circuit case *Jennings v. University of North Carolina* for the proposition that "the burden of showing a concrete, negative effect is sufficiently rigorous." Br. at 20 (quoting 482 F.3d 686, 699 (4th Cir. 2007) (en banc)). However, *Jennings* was decided on a motion for summary judgment. In *Jennings*, the plaintiff survived summary judgment because "[s]he **testified** that the hostile atmosphere created by [the soccer coach] made her feel humiliated, anxious, and uncomfortable; these effects, in turn, had a negative impact on her participation and performance in soccer and on her academic performance." *Id*. at 699 (emphasis added). As this case is at the pleadings stage, no testimony has been taken for Plaintiff to make a similar showing. Testimony from DJ, his parents, and relevant school officials who interacted with him will further demonstrate the affect the harassment and discrimination had on DJ's ability to learn. However, at this stage, Plaintiff has pled sufficient facts to draw the inference that a jury could find that the "severe emotional distress" experienced by DJ as a result of the assault on him "had a concrete, negative effect on [his] ability to participate" in educational programs at school. *Id*. at 700.

The facts of *Davis v. Monroe County Bd. of Education* are illustrative on this point. 526 U.S. 629 (1999). In *Davis*, the Supreme Court ended its opinion by "conclud[ing] that the

Eleventh Circuit erred in dismissing petitioner's complaint." *Davis*, 526 U.S. at 653. After

finding that the harassment alleged was sufficiently severe, the Court turned to the question of

whether that harassment denied the plaintiff an educational benefit. It ruled that the plaintiff had

been denied an education benefit because "petitioner **contends that the harassment had a**

**concrete, negative effect** on her daughter's ability to receive an education." *Id*. at 654 (emphasis

added). The use of the word "contends" demonstrates that at the pleadings stage, the averments

of plaintiffs as to the impact on their education are sufficient to survive a motion to dismiss.

Further, if a "dropoff in [the plaintiff's] grades provides necessary evidence of a potential link

between [his] education and [the] misconduct," which drop DJ also suffered, then being so

miserable that DJ was forced to change schools provides further such evidence. *Id*. at 652.

DJ was subjected to a horrific assault at school at a young age. In the assault's aftermath,

the school environment became hostile and painful for him as he was targeted for continued

abuse. ¶¶ 39-40. After trying to endure an environment where he was subjected to constant, daily

harassment and reminders of his trauma with no help from the administration, DJ's parents were

forced to move him to a new school, further disrupting his education and IEP in an attempt to

improve his mental well-being. ¶¶ 39-41. Despite that difficult decision by his parents, DJ

continues to face psychological problems as a result of the harassment and trauma he endured at

SPMS. ¶ 42. As averred, the hostile and dangerous school environment to which DJ was

subjected, as well as his sudden and subsequent school change brought about as a result of the

assault on him, caused significant complications and disruptions to his learning environment.

This hostile environment effectively barred DJ from accessing educational opportunities and

benefits at SPMS. ¶ 43.

Finally, if the Court has any doubt about the effect of the racist sexual assault on DJ, it

needs only observe that DJ was forced to transfer to a different school as a result of his

treatment. This transfer would have obviously carried with it all the difficulties that would attend to any change in schooling—including, most importantly for the purposes of this suit—the disruption of educational continuity.  It is thus not surprising that other courts have held that transferring schools is an example of the negative effects contemplated under *Davis v. Monroe County*. *See e.g.*, *Mason v. Roman Catholic Archdiocese of Trenton*, No. 18-10733, 2019 U.S. Dist. LEXIS 48212 *13 (D.N.J. March 22, 2019); *Roe v. Pa. State Univ.*, No. 18-2142, 2019 U.S. Dist. LEXIS 24870 *15 (E.D. Pa. Feb. 15, 2019); *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017). The need of DJ to attend a new school allows this court to infer the concrete and negative effect the harassment and assault had on his ability to receive an education. Indeed, as a logical matter, where an assault is so egregious that a student flees the school for his own physical and mental safety, the denial of an educational benefit is explicit in the fact that **he was unable to attend that school**. Whether a student is able to attend a different school is entirely beside the point, and a victim's efforts to resettle himself in a new school should not inure to the benefit of those who failed to protect him. Of course, and as noted above, even though DJ did transfer to a new school, this move was not seamless and continues to have lasting effects. But even it did not have such effects, this Court should not allow a child to be chased out of a public school he was assigned to by a racial and sexual assault, and then allow the School Board to argue that the child was not denied an educational benefit.

In sum, the Amended Complaint plausibly avers that DJ was denied an educational benefit.  It avers that DJ was assaulted, harassed, humiliated, and ultimately forced to transfer to a different school. Such allegations, when proven at trial (as they will be) are sufficient for a reasonable jury to find that DJ did indeed suffer a denial of an educational benefit.

**B.**     **School Board had Actual Notice**

Whether the School Board had actual notice of the harassment and discrimination against DJ is also normally a question of fact for a jury to decide. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (holding that the actual knowledge component of the deliberate indifference standard is normally a question of fact for the jury). Defendants argue that the School Board cannot be said to have had notice because: (1) the Amended Complaint does not allege that the School Board "was specifically apprised" of the incident on October 4; (2) the School Board was not aware of prior harassment of DJ specifically prior to October 13; (3) and Plaintiff has not alleged specific facts showing that the School Board knew of the harassment aimed at DJ after the assault on October 13. These arguments are unavailing.

The first argument is legally irrelevant, as notice to the School Board can be imputed through knowledge of an appropriate person. The second argument also fails because under Fourth Circuit precedent, knowledge of previous harassment does not need to be specific to the individual plaintiff. Lastly, the third argument fails because at a very minimum, the Board's knowledge of the assault on DJ, knowledge that the video of the assault was shared widely on social media, and the communications between DJ's parents and the SPMS administrators put the Board on notice of the continued harassment being faced by DJ.

1.     The Notice Can Be Imputed Through an Appropriate Person

For the purposes of Title VI and IX claims, "liability may be imputed to an educational entity (such as the Board) premised on the actual knowledge of a school official (like [McAuley and Bowers]) who has 'authority to address the alleged discrimination and to institute corrective measures on the [educational entity's] behalf.'" *Doe v. Bd. of Educ.*, 605 Fed. Appx. 159, 165 n. 8 (4th Cir. 2015) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The Defendants' contention that "The Plaintiff has not alleged that the School Board was

specifically apprised of [the incident on October 4]" is irrelevant. Br. at 17. As Defendants state later in their brief, knowledge may be imputed to the School Board through knowledge by an appropriate person—one who "at a minimum has authority to address the alleged discrimination and to institute corrective measures." *Gebser*, 524 U.S. at 290. Principal McAuley and Coach Bowers, among others, had the authority to institute corrective measures to address the discrimination. Therefore, their knowledge may be imputed to the School Board.

2.     The Notice Need Not Be Plaintiff Specific

The Fourth Circuit has held that "a Title IX plaintiff is not required to demonstrate actual knowledge that a **particular** student was being abused." *Baynard v. Malone*, 268 F.3d 228, 238 n. 9 (4th Cir. 2001) (emphasis added). *See also Bell v. Bd. of Educ.*, 290 F. Supp. 2d 701, 706 (S.D.W. Va. 2003). In support of their contention to the contrary, that the "Plaintiff must show that the harassment was 'plaintiff specific,'" the Defendants cite *Facchetti v. Bridgewater College*, a non-controlling district court case. Br. at 17 (quoting *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 639 (W.D. Va. 2016)).  However, that decision misreads *Baynard v. Malone* and runs contrary to established Fourth Circuit precedent.

Respectfully, the court in *Facchetti* reached the incorrect conclusion that deliberate indifference claims require that a "defendant have actual notice of harassment against the plaintiff" through a hurried reading of *Baynard*. The *Facchetti* court correctly noted that the *Baynard* decision held that the school could not be held liable in that case because the principal did not have actual knowledge of the harassment. *Facchetti*, 175 F. Supp. 3d at 640 (citing *Baynard*, 268 F.3d at 237-38). However, the *Facchetti* court erred in stating that the *Baynard* court had reached that decision "because there was no evidence that the principal was actually aware that **the** student-plaintiff was being abused." *Id*. at 640 (emphasis added). In fact, the decision in *Baynard* held that the principal did not have knowledge "that **a** student was being

11

abused." *Baynard*, 268 F.3d at 238 (emphasis added). Under Fourth Circuit precedent, the Plaintiff does not need to show that the appropriate person had knowledge of harassment against **the** student bringing the suit. Plaintiff need only show that an appropriate person had knowledge of harassment or discrimination against **a** student.

This rule makes logical sense, for a school principal should not be able to bury his head in the sand in this manner. If, for instance, he is told that a sexual predator is loose in the school, a principal could hardly defend himself by arguing, "I knew that all my students were at risk of being attacked, but I didn't know which one in particular was attacked, so it was ok that I did nothing." Indeed, the Supreme Court rejected this exact logic in *Farmer v. Brennan*, a case applying the same deliberate indifference test applicable here. In *Farmer*, the Court explained that a prison administrator may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [victim of an assault] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843–44.  Explaining the point further, the Court stated "[i]f, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep [but] instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." *Id*. (internal quotation marks and citations omitted).

In sum, Plaintiff has pled sufficient facts to establish that both Principal McAuley and Coach Bowers had notice of the discrimination against African-American students on the SPMS football team. The point that the Defendants may not have known DJ specifically was at risk of harm is, even if true, irrelevant.

3.    Facts Demonstrating Notice

At the very latest, SPMS administrators—individuals with the authority to take corrective action—were aware on October 4, 2017 or October 5, 2017, that male, African-American students were being discriminated against in the boys' locker room at SPMS. In particular, the Board knew that race-based harassment was occurring in the locker room, with African-American football players being victimized by non-African-American players. Thus, there is clear evidence that the Board was aware that students situated as DJ was in this case were being subjected to race-based harassment at least *eight or nine days before DJ was assaulted*.

Further allegations in the Amended Complaint that show such knowledge include statements at the community meeting on October 25, 2017, in which "numerous parents stood to tell stories of racial, sexual, economic, and other forms of discrimination and harassment that their children had suffered while attending SPMS and other HCPS schools." ¶ 45. Those parents stated that "they had gone to Principal McAuley, the School Board, and other members of the administration at SPMS and other schools, but nothing had changed." *Id*.  Indeed, it was stated, "There is a systemic problem of racism and bullying at Short Pump Middle School that is not being addressed"; "When black students are being bullied and sexually harassed, you do nothing." ¶ 46. These parent statements allow the Court to further infer that the Board had notice of previous sex and race-based discrimination occurring at SPMS and other schools within Henrico Public Schools.

As to the harassment continuing after the assault on October 13, 2017, there can be little doubt that teachers—officials with the authority to address the discrimination and institute corrective measures—were aware of the harassment that occurred in the classrooms and hallways of SPMS. ¶ 39. That harassment occurred regularly in the open and in plain view of teachers and SPMS staff. Further, Defendant McAuley and other SPMS administrators were

13

aware on October 13 or 14 that the video of the assault had been posted on social media and had been seen and discussed by hundreds of different students. Any reasonable middle school principal or teacher would know that the sharing of that video—which itself constitutes continued harassment—would be occurring in the school itself as well.

The actual knowledge requirement does not allow officials to bury their heads in the sand in other contexts, nor should it here. For instance, in the criminal context, the Supreme Court recently reaffirmed that "knowledge can be inferred from circumstantial evidence." *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019) (quoting *Staples v. United States*, 511 U.S. 600, 615, n.11 (1994)). Likewise, in the prison context, the Supreme Court in *Farmer v. Brennan* rejected the argument that "without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates," finding that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." 511 U.S. 825, 842 (1994).

In sum, a rational juror could find that McAuley's knowledge that DJ was being publicly shamed and humiliated through the distribution of the video shows knowledge of DJ's harassment. This conclusion is only further buttressed by the fact that additional harassment occurred in the school building in the midst of dozens of teachers and administrators—which is circumstantial evidence that at least some of those persons had actual knowledge of the ongoing harassment of DJ occurring in the halls of SPMS.

### C.    School Board was Deliberately Indifferent

A school board acts with deliberate indifference in the face of student-on-student harassment when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). Importantly, whether a school acted with deliberate indifference is a quintessential question of

fact that is normally reserved for the jury. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007). It is thus not surprising that district courts around the country routinely rule that whether a "school's actions…amount[] to deliberate indifference is a question of fact that a jury should resolve." *Porto v. Town of Tewksbury*, No. 04-10003-PBS, 2005 U.S. Dist. LEXIS 42043, at *5 (D. Mass. June 17, 2005); *see also, e.g., Roe ex rel Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1039 (E.D. Cal. 2009) ("[A] question of material fact exists as to whether [the School District] exhibited deliberate indifference."). This is true even at the motion for summary judgment stage. *See, e.g., Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321 *31 (W.D. Mich. March 31, 2015). (declining to grant summary judgment to either side because "[t]he record creates a question of fact as to whether the school's responses were clearly unreasonable in light of the known circumstances").

Defendants argue that Plaintiff has not established deliberate indifference because he has "failed to allege facts sufficient to create the plausible inference that the School Board made a decision **to remain idle** in the face of known student-on-student harassment or that there was **no attempt** to remedy such harassment." Br. at 18 (emphasis added). The Board seems to be arguing that, as long as it took some action, regardless of how unreasonable or ineffectual that action was, it cannot be held liable.[2] However, the law holds the Board to a far higher duty than Defendants would have this Court believe. The Fourth Circuit has clearly stated that plaintiffs need **not** demonstrate a complete failure to act. *See S.B. v. Bd. of Educ.*, 819 F.3d 69, 77 (4th Cir. 2016) ("That is not to say, of course, that only a complete failure to act can constitute deliberate

---

[2] Defendants rely on the case of *Facchetti v. Bridgewater College* for this principle. 175 F. Supp. 3d 627 (W.D. Va. 2016). Defendants quote *Facchetti* for the principle that "Title IX claims surviving dismissal typically 'involve[] allegations of complete inaction[s] in the face of [] harassment.'" Br. at 19 (quoting *Facchetti*, 175 F. Supp. 3d at 638). There is no indication in the opinion that such a statement was based on an empiric review; regardless, however, that is not the legal standard.

indifference, or that any half-hearted investigation or remedial action will suffice to shield a school from liability."). Of course, the Fourth Circuit is doing nothing here but repeating Supreme Court authority, which holds that liability attaches if a school's "response to the harassment or lack thereof is **clearly unreasonable in light of the known circumstances**." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999) (emphasis added).  Thus, what matters in the deliberate indifference inquiry in this case is not whether the Board took any action at all, but whether the action that it took was reasonable in light of the circumstances.

In considering this issue, it will be helpful to focus on two different events: (1) the October 13 assault and (2) the post-October 13 harassment.  Starting with the October 13 assault, there is no dispute in this case that the Defendants were on notice of race-based violence in the locker room at least a week before the October 13 incident. The Defendants' entire response to this violence was to have a meeting, determine that the football players would no longer be allowed in the locker room without adult supervision, and to promise the same to DJ's father. ¶ 24. Crucially, the Defendants never followed through on this promise, so the question for the Court is whether the meeting and unfulfilled promise are a sufficient response to race-based violence on the football team. To ask the question is almost to answer it, because no reasonable person could think that a reasonable way to respond to such a serious risk, the risk of race-based violence on the football team, is for adults to merely meet and discuss the problem without doing anything to combat the danger. The Defendants maintain that they intended to do more than simply talk about the problem, but what matters here is not what they wished they had done after the fact, but what they actually did.

Defendants end their section on deliberate indifference with a quote from *Facchetti* — "here the 'allegations of deliberate indifference pale in comparison to other cases where a plaintiff's Title IX claim has survived dismissal.'" Br. at 19 (quoting *Facchetti*, 175 F. Supp. 3d

at 638). That statement is legally irrelevant and in poor taste. The attempt to minimize or downplay the severity of the trauma DJ has endured is disheartening. Further, the fact that the assault suffered by DJ could have been even worse, or that the School Board's response could have been even more indifferent, does not change the fact that DJ did suffer from a severe assault and the School Board did exhibit deliberate indifference to such.

Turning to the post October 13 harassment, the Defendants' response is also clearly unreasonable. For this issue, it is important to focus on what the Defendants did after the October 13 incident, which included holding a community meeting (where multiple parents highlighted systemic problems in the School Board's reaction to similar instances), talking to the football team (and in doing so, joking about the incident and attempting to minimize it), and granting Plaintiff's request to transfer to a different school (after he was already attacked and then subjected to continued harassment under their watch). As to the community meeting and football team meeting, neither provided any support to DJ specifically. Additionally, both of those actions took place after the traumatic assault on DJ had already occurred, and neither were geared towards minimizing the effect of that trauma on DJ or his continued harassment. And as to the granting of the waiver, that action cannot be considered sufficient to elevate the Defendants' mental state above deliberate indifference. Such an argument is akin to a prison official stating that he was not deliberately indifferent because while he did sit by and watch as the individual became gravely ill, he called for an ambulance after the inmate collapsed. That contention would not hold water in the context of prison, and it certainly should not in this case.

Perhaps most importantly, Defendants fail to mention the multitude of actions and inactions on the part of the School Board, McAuley, SPMS administrators, and Bowers that evince deliberate indifference. These include: not informing all parents of students on the football team about the altercation on October 4; failing to supervise the boys in the locker room

17

on October 13 (if not other times), despite promising Mr. Johnson (and likely others) that such supervision would occur; attempting to dismiss the attack as a "joke" in a statement to the football team; not contacting DJ's parents after learning of the existence of the video on October 14; interviewing the boys who were assaulted, including DJ, without their parents present, further exacerbating their trauma; telling the boys to keep what happened to themselves; and failing to take steps to mitigate the harassment DJ faced at school in the aftermath of the assault and the video being shared with hundreds of people on social media. ¶¶ 20-39. These actions / inactions, and the reasonable inferences that flow from them, state a claim for deliberate indifference to known student-on-student harassment under Title VI and Title IX.

### III.    Plaintiff States a Plausible Claim Under the State-Created Danger Theory

In the aftermath of *DeShaney*, it has become perhaps axiomatic that instances of private violence do not constitute a violation of the Due Process Clause. *See DeShaney v. Winnebago Ct. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, that statement is not absolute. Two primary exceptions exist to this rule—the special relationship and state-created danger doctrines. *Doe v. Rosa*, 795 F.3d 429, 437-38 (4th Cir. 2015). Defendants, based on an unpublished Fourth Circuit opinion that they fail to mention was unpublished, contend that the special relationship exception is inapplicable to school children, and thus Plaintiff must rely on the state-created danger theory. Br. at 9. Defendants further argue that assurances of protection do not constitute a state-created danger, and thus Plaintiff's claims must fail. Br. at 11. Plaintiff does not contend that assurances alone suffice to state a state-created danger claim. Rather, Plaintiff's argument is that when assurances of protection are made by a school official to the guardian of a student that prevent that guardian from taking actions to care for the child, then the state has created a special relationship in that instance and is thus responsible for the danger it has placed the student in. Lastly, Defendants also contend that student-on-student harassment claims require a showing of

deliberate indifference on the part of the School Board to establish liability. Br. at 11. Plaintiff

has made such a showing, as evidenced above in the discussion of the Title VI and IX claims.

### A.    As-Applied State Created Danger

In the unpublished opinion relied upon by the Defendants, the Fourth Circuit held that

school officials do not have a "special relationship" with their students sufficient to implicate the

protections of the Due Process Clause. *Stevenson v. Martin County Bd. of Educ.*, 3 Fed. Appx.

25, 31 (4th Cir. 2001) (unpublished). The Fourth Circuit reached that conclusion because, in its

view, "[a]lthough a student must remain in school during the day and the school functions much

as a parent during that time, the state has not assumed total responsibility for the student's care."

*Id*.  In the view of the Fourth Circuit, the school does not assume total responsibility for its

students because "[t]he student's **parents** retain the ability to provide for his basic human needs,

**and the child remains free to seek their help and protection**." *Id*. (emphasis added). The key

distinction between schools, where a special relationship has been held not to exist as a general

rule, and prisons, where it has been recognized, is that students may seek the aid of their

parent(s) or guardian(s).[3] When that ability is somehow nullified, as Defendant Bowers did in

this case by making Mr. Johnson think there was no need to provide aid to DJ, then the state has

created a special relationship for the purposes of that student.

As alleged in the Amended Complaint, Defendant Bowers informed Mr. Johnson on

October 5, 2017 that SPMS football players would not be allowed in the locker room without

---

[3] The opinions from other circuits on which the Fourth Circuit relied in *Stevenson* to
reject the recognition of a special relationship in primary schools used similar reasoning and
language. *See e.g., Doe v. Hillsboro Independent School Dist.*, 113 F.3d 1412, 1415 (5th Cir.
1997) ("Parents remain the primary source for the basic needs of their children."); *Dorothy J. v.
Little Rock School Dist.*, 7 F.3d 729, 732 (8th Cir. 1993) ("Public school attendance does not
render a child's guardians unable to care for the child's basic needs. In this regard, public schools
are simply not analogous to prisons and mental institutions."); *J.O. v. Alton Community Unit
School Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) ("The parents still retain primary
responsibility for feeding, clothing, sheltering, and caring for the child.").

adult supervision. ¶ 24. In fact, Defendant Bowers told that to Mr. Johnson both over the phone and in person. *Id.* However, once he created that relationship, Defendant Bowers then acted in a deliberately indifferent manner by failing to supervise the students in the locker room, causing a more severe assault of the same nature to occur just eight days later. Defendants contend that no fact "alleged in the Amended Complaint leads to the inference that Bowers or any other school official knew or should have known that the perpetrators of the October 13th Incident were of particular danger to the Plaintiff." Br. at 12. That contention is false and irrelevant. It is false because Mr. Johnson specifically reached out to Defendant Bowers, indicating that his son had been affected by the incident in the locker room. Further, it is DJ with whom Defendant Bowers created the special relationship by making assurances to his father, Mr. Johnson. Moreover, Defendants' contention is irrelevant because even if Defendant Bowers did not know that DJ specifically would be harmed in the locker room, he knew that the students on the football team were a danger to each other if left alone in the locker room, and that African-American students had been previously targeted. Despite that knowledge, Bowers left the students alone and unsupervised to be assaulted. That constitutes deliberate indifference.

### B.     Supervisory Liability

Supervisory liability in the Fourth Circuit is governed by *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). Under *Shaw*, a plaintiff can establish supervisory liability by plausibly pleading:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Defendants argue that Plaintiff's Amended Complaint fails to satisfy the *Shaw* elements because: (1) Plaintiff has failed to plead facts to show that the conduct was pervasive and

Defendants McAuley and Bowers were aware of it; (2) the minimal actions taken by Defendants Bowers and McAuley show a lack of deliberate indifference; and (3) the failure to supervise cannot be causally connected to DJ's injuries. Each of these arguments hold little merit and they will be addressed in turn. Additionally, the Fourth Circuit has cautioned that the issue of supervisory liability is "ordinarily one of fact, not law," and thus the burden on the Defendants at the motion to dismiss stage is quite high. *Id*. at 799.

Plaintiff has pled facts sufficient to establish that Defendants McAuley and Bowers knew or *should have known* that their inaction would cause serious harm to DJ. *See id*. (supervisory liability can be established through "actual or constructive knowledge"). Defendants argue that Plaintiff has alleged only one previous incident occurring in the locker room, which they contend does not suffice to put McAuley and Bowers on notice. However, at the pleadings stage, the Court may infer from the fact that Bowers and McAuley (along with other SPMS administrators) had an immediate meeting regarding the lack of supervision in the boys' locker room that the October 4 incident was not the first of its kind. The case of *Lee v. Queen Anne's County Office of Sheriff* is informative as to the burden required for the first element of a *Shaw* claim at the motion to dismiss stage. *See* No. RDB-13-672, 2014 U.S. Dist. LEXIS 15225, at *25-34 (D. Md. Feb. 5, 2014).

In *Lee*, the plaintiff brought multiple § 1983 suits stemming from a traffic stop on or about March 4, 2010. *Id*. at *3. After the plaintiff was convicted of "fraud, failure to stop, and driving with a revoked license and sentenced to two (2) months imprisonment," the "State's Attorney entered an order of *nolle prosequi*" because the officer testified falsely and no probable cause excited. *Id*. at *5-6. The plaintiff brought, among other claims, a *Shaw* supervisory liability charge against the Sheriff. *Id*. at *32. The previous incidents the plaintiff included in his complaint were: a deputy who had been convicted of second-degree assault for groping a woman

in his patrol car in May 2009; three deputies who were suspended for misconduct during a traffic stop in August 2007; and an excessive force case in March 2004. *Id*. at 31-33. Of those incidents, the only one related to the plaintiff's constitutional injury was the 2007 traffic stop, which raised Fourth Amendment issues. *Id*. at 33. The district court found that to be sufficient—especially when combined with the other incidents which showed an overall failure to properly supervise—to "plead a plausible claim." *Id*. at 33. In this case, the Plaintiff has identified an incident of a very similar nature that occurred a mere **eight days** before the assault in question. ¶¶ 17-21.  This conduct of eight days' past has a far closer association to the events at hand than the three years implicated between the traffic stops in *Lee*.

Plaintiff has also pled facts sufficient to infer deliberate indifference on the part of Defendants McAuley and Bowers in their response to the constitutional abuses. Defendants contend that "[e]ven if the decision to require constant supervision of the locker room was not successfully implemented, it demonstrated sufficient diligence to overcome a claim of deliberate indifference." Br. at 14. The potential ramifications of such an argument are staggering. Under Defendants' view, any state actor can defeat a claim of deliberate indifference by writing down an aspiration on a piece of paper. In the Eighth Amendment context, a prison official would not be able to defeat a claim of deliberate indifference to a serious medical need of an inmate by pointing to an email he wrote professing a desire to get that inmate assistance, *if there is no evidence he actually made any effort to obtain that assistance*. The same is true here. Defendants McAuley and Bowers cannot hide behind their determination that SPMS football players were to be supervised in the boys' locker room, if there is *no evidence that such supervision occurred*. In fact, the Amended Complaint demonstrates that no such supervision occurred.

Defendants' last contention, that neither "Bowers or McAuley had any basis to anticipate that their subordinates would fail to supervise the boy's locker room" on October 13, 2017 also

is unpersuasive. Br. at 15. Once again, the question of supervisory liability is a question of fact

not well suited for a pleadings stage argument. Similarly, the Fourth Circuit in *Shaw* stated that

"affirmative causal link...encompasses both cause in fact and proximate cause," *id*., both of

which are also generally questions of fact for the jury. *See Griffin v. Shively*, 227 Va. 317, 320

(1984). Moreover, the Amended Complaint contains facts sufficient for this court to infer that

Defendants Bowers and McAuley did have a basis to anticipate their subordinates would fail to

supervise the SPMS football team. Among other things, the fact that no one was supervising the

players on October 4 – such that that incident occurred in the first place – suggests that locker

room supervision was not already a normal protocol, would be a novel implementation going

forward, and would thus be prone to problems of implementation and execution. Moreover,

players who engaged in subsequent locker room abuse did not appear worried about supervision

or even the thought that supervision might ever occur. Among the jeering comments added to the

video placed on social media included the defiant statement, "ever wonder what happens in the

football locker room," accompanied by heinous descriptions of what occurred secretly therein.

¶34. Plaintiff has met the burden for these claims to pass to a jury for consideration.

## IV.    <u>Vocational Rehabilitation Act</u>

A plaintiff states a claim for discrimination in violation of Section 504 of the Vocational

Rehabilitation Act ("Rehabilitation Act") if he alleges facts showing that he: (1) has a qualifying

disability, (2) is otherwise qualified to receive some public benefit, and (3) was excluded from

participation in, or denied the benefits of, a public program or activity on the basis of his

disability. *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir. 1999). Critically, the fact that some of

Plaintiff's allegations may not relate to his disability is not fatal to his disability discrimination

claim. *See James v. Peter Pan Transit Mgmt*., *Inc.*, No. 5:97-CV-747-BO-1, 1999 U.S. Dist.

LEXIS 2565 * 20-21 (E.D.N.C. Jan. 20, 1999).

To state a claim for relief under Section 504 of the Rehabilitation Act associated with disability-based discrimination, the Fourth Circuit requires a plaintiff to allege a "failure to provide the free appropriate education required by the Individuals with Disabilities Education Act," and either "bad faith" or "gross misjudgment" on the part of the school officials. *D.N. v. Louisa Cnty. Pub. Sch.*, 156 F. Supp. 3d 767, 776 (W.D. Va. 2016) (quoting *Sellers by Sellers v. Sch. Bd. of City of Manassas, Va.,* 141 F.3d 524, 529 (4th Cir. 1998) (internal quotation marks omitted)). *See also K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 792 (D. Md. 2014) ("In the Fourth Circuit, ... plaintiffs must show bad faith or gross misjudgment by the school system to establish Section 504 discrimination in the education context.").

As stated in the Amended Complaint, in October of 2017, DJ had an Individualized Education Plan ("IEP") due to his severe attention deficit hyperactivity disorder ("ADHD"). ¶11. Defendants argue that Plaintiff's claim cannot be sustained because he does not allege that "the students that assaulted and harassed him knew that he had an [IEP] or disability." Br. at 21. Such an allegation would be nearly impossible to make at the pleadings stage, which is why questions of subjective knowledge are traditionally questions of fact addressed by the jury. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (holding that in the context of deliberate indifference to medical needs, whether an official "had the requisite knowledge of a substantial risk is a question of fact"). Depositions of the students who assaulted DJ, as well as other information gleaned through discovery, will help to further elucidate the exact motivation, or motivations, behind the attacks on DJ.

Defendants also contend that Plaintiff's Section 504 claim must be dismissed because he does not allege that "any Defendant failed to address the assault and harassment because of the Plaintiff's alleged disability." Br. at 21. As an initial matter, DJ has a disability as defined by the Rehabilitation Act because his mental impairment substantially limits his major life activities,

such as learning. *See* 29 U.S.C. § 705(9)(B) (defining disability for purposes of Section 504 by reference to the Americans with Disabilities Act, 42 U.S.C. § 12102); 42 U.S.C. § 12102(1)(A) (defining disability as an individual with "a physical or mental impairment that substantially limits one or more major life activities of such individual"); 34 C.F.R. § 104.3(j)(2)(ii) (defining majority life activity as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, **learning**, and working) (emphasis added). Further, if the harassment aimed at DJ was based on his disability, then the motivation of the School Board in failing to remedy that discrimination is irrelevant. The only relevant consideration is whether Defendants showed a "gross misjudgment." *D.N.*, 156 F. Supp. 3d at 776. The failure of Defendants to take any action aimed at assisting DJ's recovery from the trauma in the aftermath of the assault or to take efforts to remedy the ongoing harassment shows gross misjudgment. Plaintiff has thus stated a plausible claim under Section 504 of the Vocational Rehabilitation Act.

## V.    <u>State Tort Claims</u>

Defendants give little credence to Plaintiff's state-law negligence claims. In a few short paragraphs, Defendants aver that Counts VI and VII—alleging gross negligence and willful and wanton negligence—must be dismissed because "Plaintiff has failed to identify a legal duty that Bowers or McAuley breached." Br. at 21. Moreover, the Defendants claim that in Virginia, "no generalized legal duty to 'exercise reasonable care with regard' to students exists." Br. at 21 (quoting ¶¶ 95, 109). Contrary to such bold assertions, the Supreme Court of Virginia has held that school officials have "a duty to supervise and care for [students]" and can be held liable only if they failed to discharge their "'duties as a reasonably prudent person would under similar circumstances.'" *Burns v. Gagnon*, 283 Va. 657, 671 (2012) (quoting *Kellermann v. McDonough*, 278 Va. 478, 487 (2009)). As school officials, Defendants McAuley and Bowers had a duty to supervise and care for DJ. Both McAuley and Bowers breached that duty by

25

leaving DJ and the other students unsupervised in the boys' locker room, despite their knowledge of the risk of harm stemming from that lack of supervision. That breach of duty led directly to the assault on DJ and other students, making McAuley and Bowers liable for the assault.

### A.    Defendants McAuley and Bowers Had a Duty to Supervise DJ

In *Burns v. Gagnon*, the Supreme Court of Virginia addressed, for the first time, "[w]hether a special relationship exists between a principal and student." 283 Va. at 669. The Court "decline[d] [the plaintiff's] invitation to expand our special-relationship jurisprudence to include the principal-student relationship." *Id*. at 670. However, that decision did not absolve Burns, a vice principal and the defendant in that case, of all duties under the law. Instead, the court built off its decision in *Kellermann*, expanding the duty recognized in that case to apply to principals as well.

In *Kellermann*, the Supreme Court of Virginia held that "when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care." 278 Va. at 487. In *Burns*, the plaintiff argued that Burns had the same "common-law duty to supervise and care for him." 283 Va. at 671. The court "agree[d]…that the duty recognized in that case [*Kellermann*] is applicable here." *Id*. Therefore, under Virginia law, a principal owes "at least a common-law duty to supervise and care" for his students. *Id*.  *See also Linnon v. Commonwealth*, 287 Va. 92, 99 (2014) ("As a general rule, primary and secondary school administrators and teachers…have a 'duty to supervise and care for' all students who are on school premises or engaged in school activities.") (quoting *Burns*, 283 Va. at 671)).

### B.    Defendants McAuley and Bowers Further Assumed a Duty to Supervise DJ

Even if this court holds that Bowers and McAuley did not owe a duty to DJ on the basis of being a coach and an administrator at SPMS, both Bowers and McAuley can still be held

26

liable for gross negligence and willful and wanton negligence because they "voluntarily undertook such [a] duty [to protect] by expressly communicating [their] intention to do so." *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 136 (2018). In *Burns*, the Supreme Court of Virginia found that an "assistant principal was subject to liability for breach of a voluntarily assumed duty based on his express promise to take care of the impending fight." *Id*. at 137 (quoting *Burns v. Gagnon*, 283 Va. 657, 672-73 (2012)). In *Terry*, the Court warned that "the recognition of a voluntarily assumed duty to warn or protect against the danger of criminal assault by a third person should be confined to express undertakings." *Id*. at 141. That is exactly the situation in this case. Principal McAuley and Coach Bowers expressly promised to supervise the football team while the players were in the locker room at SPMS. These Defendants thus voluntarily assumed the duty to do exactly what they promised they would do.

### C. Defendants McAuley and Bowers Breached that Duty

As discussed above, Defendants McAuley and Bowers had both "a common-law duty to supervise and care" for DJ and other students as SPMS, and a voluntarily assumed duty to provide adult supervision for the locker room at SPMS. *Burns*, 283 Va. at 671. Defendants McAuley and Bowers breached that duty by leaving the SPMS football players unsupervised in the boys' locker room on October 13, 2017. That lack of supervision directly led to a racially charged sexual assault being committed against DJ by other members of the football team.

### D. That Breach Constitutes Gross and Willful and Wanton Negligence

Gross negligence is "such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971). The distinction between "ordinary negligence and gross negligence is one of degree," not one of "kind." *Green v. Ingram*, 269 Va. 281, 292 (2005). Gross negligence claims are evaluated based on an objective, reasonable person standard. *Hixson v. Hutcheson*, No. 5:17-CV-032, 2019

U.S. Dist. LEXIS 11326 *19 (W.D. Va. Jan. 23, 2019). Willful and wanton negligence, on the other hand, does require subjective awareness, and is defined as an "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All American Pest Control, Inc*., 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)). Lastly, both gross negligence and willful and wanton negligence are normally questions of fact for the jury. *See Griffin v. Shively*, 227 Va. 317, 320 (1984) ("Generally, negligence (whether ordinary, gross, or willful and wanton), contributory negligence, and proximate cause are issues for a jury's resolution."). It is only where "reasonable minds could not differ" that a court may dismiss a gross or willful and wanton negligence claim on a motion to dismiss. *Id*.

In this case, reasonable minds could certainly differ about whether Defendants McAuley and Bowers's actions and inactions, as alleged in the Amended Complaint, constituted gross and willful and wanton negligence. In reaching this conclusion, it is essential to bear in mind two points. First, "evidence that a defendant had prior knowledge or notice that his actions or omissions would likely cause injury to others is a **significant factor** in considering issues of willful and wanton negligence" (and by implication, gross negligence as well). *Alfonso*, 257 Va. at 546 (1999) (Emphasis added). Such prior knowledge can come from a specific warning or instead from "specialized . . . training" that the defendant has received about the circumstance. *Id*.  In this case, reasonable minds could easily find that the Defendants had prior knowledge based on *both* a specific warning (conveyed to them by DJ's father) *and* their specialized training as school administrators. This is not a case of a teenage babysitter taking their eye off a child for a period of time. Rather, it is a case of trained educators with the responsibility for supervising hundreds of children failing to fulfill a basic duty to protect them.

28

Second, on the issue of the October 13 assault (as distinct from the post-assault harassment), it is also important to bear in mind the gravity of the harm faced by DJ (i.e., race and sex-based violence) and the simplicity of the solution available to Defendants (i.e., locker room supervision). The Defendants could have thus avoided immense and long-lasting harm through a simple administrative act. But they failed to do this. Such a failure would certainly "shock fair minded [people]." *Ferguson* 212 Va. at 92. And lest the Court have any doubt on that point, it can rely on the fact that, after this incident was reported, middle-school parents expressed their collective outrage to Defendant McAuley at a community meeting on October 25. At this meeting, parents complained that "[w]hen black students are being bullied and sexually harassed, you do nothing." ¶ 46. The Defendants' actions in this case certainly shocked the parents after DJ's assault was publicized and, respectfully, unless this Court is prepared to dismiss the parents' opinions, it must refuse the Defendants' efforts to dismiss this claim.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

"DJ," A MINOR, BY AND THROUGH HIS
NEXT FRIEND AND MOTHER, ROBIN
HUGHES, AND HIS NEXT
FRIEND AND FATHER, QUENTIN JOHNSON,


By: _____/s/ Mark J. Krudys_____
Counsel

<table>
<tr><td>Charlotte P. Hodges (VSB# 41547)</td><td>Mark J. Krudys (VSB# 30718)</td></tr>
<tr><td>B.I.G. LEGAL SERVICES, PLLC</td><td>Daniel Zemel (VSB# 95073)</td></tr>
<tr><td>P.O. Box 4302</td><td>THE KRUDYS LAW FIRM, PLC</td></tr>
<tr><td>Midlothian, VA 23112</td><td>SunTrust Center</td></tr>
<tr><td>Phone: (804) 475-5484</td><td>919 E. Main Street, Suite 2020</td></tr>
<tr><td>Fax:    (804) 482-2479</td><td>Richmond, VA  23219</td></tr>
<tr><td>Email:  biglegal10@verizon.net</td><td>Phone: (804) 774-7950</td></tr>
<tr><td></td><td>Fax:    (804) 381-4458</td></tr>
<tr><td></td><td>Email:mkrudys@krudys.com;</td></tr>
<tr><td></td><td>       dzemel@krudys.com</td></tr>
</table>

*Counsel for Plaintiff*

30

**Certificate of Service**

I hereby certify that on this 31st day of January 2020, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send

notification of such filing to the following:

John D. Gilbody, Assistant County Attorney
Ryan P. Murphy, Assistant County Attorney
Joseph P. Rapisarda, Jr., County Attorney
County of Henrico, Office of the County Attorney
P.O. Box 90775
Henrico, VA  23273-0775
gil077@henrico.us
mur047@henrico.us
rap@henrico.us

_____ /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone:  (804) 774-7950
Fax:  (804) 381-4458
Email:  mkrudys@krudys.com
*Counsel for Plaintiff*

31