**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **"DJ," A MINOR, BY AND THROUGH HIS NEXT FRIEND AND MOTHER, ROBIN HUGHES, AND HIS NEXT FRIEND AND FATHER, QUENTIN JOHNSON,** | ) <br> ) <br> ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| **v.** | ) **Case No. 3:19-cv-00905-MHL** <br> ) |
| **SCHOOL BOARD OF HENRICO COUNTY,** | ) <br> ) |
| **THOMAS MCAULEY,** | ) <br> ) |
| **SCOTT BOWERS, and** | ) <br> ) |
| **JOHN DOES 1-3,** | ) <br> ) |
| **Defendants.** | ) <br> ) |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT
<u>FOR FAILURE TO STATE A CLAIM</u>**

Defendants County School Board of Henrico County, Virginia ("School Board"), Thomas McAuley ("McAuley"), and Scott Bowers ("Bowers") (collectively the "School Defendants"), by counsel, state the following in support of their Motion to Dismiss the Amended Complaint for Failure to State a Claim.

## INTRODUCTION

The Plaintiff's Memorandum in Opposition to Defendants School Board of Henrico County, McAuley, and Bowers' Motion to Dismiss ("Opp'n Mem.") (ECF 15) fails to demonstrate that the Plaintiff has any viable legal claims against the School Defendants. The crux of the Plaintiff's case is that the School Defendants were on notice that a racially motivated

sexual attack was foreseeable. This premise is implausible on its face. The Plaintiff has identified a single instance of racial harassment that occurred prior to the incident on October 13, 2017 (the "October 13th Incident"). According to the Amended Complaint, that incident consisted of the use of a slur and a subsequent altercation between two other students (the "October 4th Incident"). Knowledge of this sole unfortunate and unacceptable incident would not lead a reasonable person to expect other children at Short Pump Middle School ("SPMS") would likely engage in a racially motivated sexual assault or even that such an assault was possible. The Plaintiff also argues that the allegations in the Amended Complaint are sufficient to show that the School Defendants' response was deliberately indifferent despite the numerous actions taken by the School Defendants.

Apparently recognizing the weaknesses in these arguments, the Plaintiff recharacterizes allegations from the Amended Complaint and introduces new allegations on brief. By and large even the cases cited by the Plaintiff support the School Defendants' position in this case. A close reading of the body of law governing the Plaintiff's claims clearly shows that the School Defendants are entitled to prevail on their Motion to Dismiss the Amended Complaint for Failure to State a Claim (ECF 13).

The Defendants do not seek to downplay what occurred to the Plaintiff. The October 13th Incident was appalling. However, the individuals that harmed the Plaintiff are not before this Court, and the School Defendants have not breached any legal duty owed to the Plaintiff.

## ARGUMENT

### I.    The Plaintiff Fails to State a Claim Under Title VI and Title IX.

The parties agree that the Plaintiff must show that "(1) [he] was a student at an educational institution receiving federal funds, (2) [he] was subjected to harassment based on [his] sex [or race], (3) the harassment was sufficiently severe or pervasive to create a hostile (or

2

abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). The School Defendants contend that the Plaintiff has not pled sufficient facts in support of the third and fourth elements to show that he is "entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"). For the following reasons, the School Defendants ask this Court to dismiss Counts III and IV of the Amended Complaint.

### A.   The Plaintiff has not established the denial of an educational benefit.

The Plaintiff relies heavily upon *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) to support his claim that he was denied an educational benefit. But the facts in *Davis* differ starkly from those in this case. The alleged harassment in *Davis* occurred over a five-month period and involved numerous incidents of unwanted touching and numerous complaints to administrators. The perpetrator of the unwanted touching was not disciplined by the school, and the touching only stopped when he was charged and pled guilty to sexual battery. *Id.* at 634.

The *Davis* Court found that to be actionable, "the behavior [must] be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652. The months of harassment pled in that case were sufficient to meet that burden. The *Davis* Court also contemplated a claim like the one brought by the Plaintiff in this case. The Court noted that:

> Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by

entertaining claims of official indifference to a single instance of
one-on-one peer harassment.

*Id.* at 652-53.

The Supreme Court has made clear that "damages are available only where the behavior
is so severe, pervasive, and objectively offensive that it denies its victims the equal access to
education that Title IX is designed to protect." *Id.* at 652. The analysis is twofold: (1) the
behavior must be so severe, pervasive, and objectively offensive that it (2) denies victims equal
access to education.

The Plaintiff was not physically excluded from an educational program or activity nor
was he effectively denied equal access to an institution's resources and opportunities. The
Plaintiff continued as a student within the school division, and there are no allegations in the
Amended Complaint that he has been harassed or bullied in his new school.[1] The Plaintiff argues
that merely transferring schools equates to the denial of an educational benefit. Opp'n Mem. at 9.
However, Title IX is designed to protect equal access to *education. Davis*, 526 U.S. at 652.
Transferring schools does not automatically equate to the denial of equal access to education.

The Plaintiff points to several district court cases that purportedly "have held that
transferring schools is an example of the negative effects contemplated under *Davis.*" Opp'n
Mem at 9. These cases note that transferring can be a factor, but they also demonstrate that the
Plaintiff cannot meet the heavy burden of showing the denial of an educational benefit.

For example, in *Roe v. Pa. State Univ.*, No. 18-2142, 2019 U.S. Dist. LEXIS 24870, at
*15 (E.D. Pa. Feb. 15, 2019), the court found that a woman who was sexually assaulted had not

---

[1] In his Opposition Memorandum, the Plaintiff states that students at his new school "continued
to taunt and harass him," and he cites paragraph 41 of the Amended Complaint in support. Opp'n
Mem. at 4. That recharacterization of the Amended Complaint is not accurate and nowhere in the
Amended Complaint does the plaintiff make this allegation.

4

been denied an educational benefit. *Id.* Even though she alleged that she missed school, her grades suffered, she was forced to seek medical treatment, and that she continued to have nightmares, the court found that the plaintiff failed "to allege a systemic denial of equal access to educational opportunities or benefits." *Roe*, 2019 U.S. Dist. LEXIS 24870, at *17.

The School Defendants agree that the October 13th Incident was appalling. That does not mean that the Plaintiff was denied an educational benefit. There are no allegations of any continuing discrimination at his new school, and this Court should follow the prescient observation by the *Davis* Court and the analysis in *Roe*, 2019 U.S. Dist. LEXIS 24870 to find that the single instance of peer-on-peer harassment did not constitute the denial of an educational benefit.

**B.    The Plaintiff has shown no basis for imputing liability to the School Board.**

**1.    The School Board did not have actual notice of current peer-on-peer harassment leading up to the October 13th Incident.**

The Plaintiff relies on a footnote from *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) to argue that the School Board had actual notice of peer-on-peer harassment leading up to the October 13th Incident. In doing so, the Plaintiff sidesteps the Fourth Circuit's actual holding and fails to account for the difference in factual circumstances between that case and the one at hand.

In *Baynard*, the Fourth Circuit concluded that Supreme Court precedent made it clear that "Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct *in question*." *Id.* at 238 (emphasis added) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)). In *Baynard*, the principal of a Virginia elementary school learned of allegations that a teacher at the school had previously molested a student. She also received a report of inappropriate contact between that teacher and a

current student from another teacher. *Id.* at 233. Although the Fourth Circuit found that the principal "should have been aware of the *potential* for such abuse," no jury could conclude that the principal "was *in fact* aware that a student was being abused." *Id.* at 238. The court continued in a footnote: "[w]e believe that the actual notice requirement could have been satisfied, for example, if [the principal] had had actual knowledge that [the teacher-assailant] was *currently* abusing one of his students, even without any indication of which student was being abused." *Id.* at 238 n.9 (emphasis added). Taken together, *Baynard* requires an appropriate school official to have actual knowledge of the ongoing harassment that is the subject of the complaint contemporaneously with its occurrence. Stated differently, a plaintiff must show that the school official actually knew of harassment related to or involving the plaintiff as it occurred, i.e., "plaintiff-specific" harassment.

This requirement explains the Plaintiff's transparent attempt on brief to recast the allegations relating to the October 4th Incident. The Amended Complaint describes this incident as the isolated incident that it was in fact. Yet on brief, the Plaintiff falsely claims that as of October 4, 2017, SPMS staff members were aware that "race-based harassment *was occurring* in the locker room, with African-American football players *being* victimized by non-African-American players." Opp'n Mem. at 13 (emphasis added). These statements are belied by the allegations in the Amended Complaint. The Amended Complaint describes a single incident involving a single Caucasian student, use of a racial slur, and a resulting fight. Am. Compl. ¶ 18. The use of the past progressive tense on brief, however artful, is not accurate. A single incident does not constitute ongoing harassment.

Recognizing that the Amended Complaint does not present the October 4th Incident as part of a current pattern of harassment and the corresponding deficiencies of the Amended

Complaint under *Baynard*, the Plaintiff urges the Court to infer from the allegation of a meeting between Bowers and McAuley that the October 4th Incident was not the first of its kind. Opp'n Mem. at 21. The School Defendants suggest that two opposing inferences are the most natural: (1) the Plaintiff is unaware of any other incidents like the October 4th Incident otherwise such incidents would have been the subject of allegations in the Amended Complaint, and (2) Bowers and McAuley met immediately to identify ways to prevent similar incidents from occurring in the future.

The latter inference becomes all the stronger given that the Plaintiff does not allege (nor could he allege) that the perpetrator of the October 4th Incident was involved in any manner with the October 13th Incident. Because the Plaintiff does not allege that his assailants were involved in discriminatory conduct leading up to the October 13th Incident, the present case is distinguished from even the footnote in *Baynard* on which the Plaintiff relies. *See* 268 F.3d at 238 n.9 ("We believe that the actual notice requirement could have been satisfied, for example, if [the principal] had had actual knowledge that [the teacher-assailant] was *currently* abusing one of his students, even without any indication of which student was being abused.") (emphasis added).

The Plaintiff also points to certain statements made at the October 25, 2017 meeting about previous peer-on-peer harassment allegedly reported to the School Board, but none of these statements indicate that the School Board "possessed actual knowledge of the discriminatory conduct in question" as required by *Baynard*. *See* 268 F.3d at 238; *see also Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 641 (W.D. Va. 2016) (concluding that allegations of prior sexual assaults occurring in the college dorms and not involving the plaintiff or perpetrator were "too tenuous" to satisfy the requirements of *Baynard*); *Rasnick v. Dickenson*

*Cty. Sch. Bd.*, 333 F. Supp. 2d 560, 566 (W.D. Va. 2004) (concluding that the superintendent's knowledge of the teacher's prior inappropriate behavior with other students did not satisfy the requirement of "actual notice" under *Baynard*); *Bell v. Bd. of Educ.*, 290 F. Supp. 2d 701, 706 (S.D. W. Va. 2003) (allegations that the school district knew that the teacher was a pedophile were insufficient, because there were no allegations that the school district had knowledge of current abuses by the teacher).

Under the rule in *Baynard*, it is irrelevant to the analysis under Title VI and Title IX whether any of the School Defendants had actual knowledge of prior isolated incidents of racial or sexual harassment at SPMS — particularly if those incidents did not involve the Plaintiff or his assailants — because actual notice is not satisfied by knowledge of the possibility or even the "substantial risk" for such harassment to occur. *See Baynard*, 268 F.3d at 237-38. Even taken together, the allegations in the Amended Complaint pertaining to the October 4th Incident and the October 25, 2017 statements do not show that the School Board had actual notice that the Plaintiff was being harassed or that the perpetrators of the October 13th Incident were harassing their peers in the months, weeks, or days leading up to October 13, 2017. Accordingly, the Amended Complaint fails to show that the School Board possessed actual knowledge of the discriminatory conduct in question before October 13, 2017.

### 2. The Plaintiff has not identified an official with actual knowledge of post-October 13, 2017 harassment who may be considered the proxy of the School Board.

The Plaintiff also alleges that his peers harassed him in plain view of teachers and other SPMS staff following the October 13th Incident. Am. Compl. ¶¶ 3, 39. Although the Plaintiff does not allege that he informed any teacher or other member of SPMS staff about any harassment following the October 13th Incident, the Plaintiff contends that the Court can infer

that SPMS teachers and staff observed it. Opp'n Mem. at 14. Further, without pointing to any factual allegation in the Amended Complaint for support, the Plaintiff argues that the video was being distributed through the school and SPMS staff knew that students were sharing the video in school.

Notwithstanding the absence of any factual allegations clearly showing that a specific school official had knowledge of continued harassment following October 13, 2017, any purported knowledge of McAuley, Bowers, or other SPMS staff members identified by the Plaintiff cannot be imputed to the School Board. In *Baynard*, a case involving teacher-student harassment, the Fourth Circuit concluded that no jury could find that the principal of a Virginia public school had the power to take corrective action on behalf of the school district. 268 F.3d at 239 (concluding that a principal in Virginia "cannot be considered the functional equivalent of the school district" despite possessing "substantial authority" over the school). Critical to the Fourth Circuit's conclusion was the statutory limits placed on the principal's authority to hire, fire, transfer, or suspend teachers, i.e., limits on the authority to take certain corrective actions that might have prevented continued harassment.

Similarly, the authority of principals and teachers to discipline students is circumscribed by statute. The School Board promulgates criteria governing the removal of disruptive students from class by teachers, *see* Va. Code § 22.1-276.2(B)(1), and it holds final authority in the case of suspensions or expulsions — though the School Board, by regulation, may make the decision of the division superintendent (or the superintendent's designee) final in the case of suspensions less than ten school days. *See* Va. Code §§ 22.1-277.04-22.1-277.06. Indeed, the principal's substantial authority to "supervise the operation and management of the school" is itself subject to supervision of the division superintendent, and the division superintendent may direct the

principal in accordance with the rules and regulations of the School Board. *See* Va. Code §§ 22.1-293(B), (D). In short, a principal of a public school in Virginia exercises limited independent authority with respect to pupil discipline and therefore cannot be considered the functional equivalent of the school district. Plainly, if McAuley cannot be considered a proxy for the School Board, his subordinates are not proxies either. Accordingly, the knowledge of McAuley, Bowers, or other SPMS staff members cannot be imputed to the School Board for purposes of Title VI and Title IX.

### 3. The Defendants were not deliberately indifferent.

The Plaintiff correctly points out that showing deliberate indifference requires a showing that the "'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" Opp'n Mem. at 14 (quoting *Davis,* 526 U.S. at 648). However, the Plaintiff overstates the limits on this Court's authority to evaluate a funding recipient's response to alleged harassment at this stage of the proceedings. The Plaintiff's assertion that deliberate indifference is "a quintessential question of fact that is normally reserved for the jury", Opp'n Mem. at 14-15, is not accurate. The Supreme Court has clearly stated that courts may determine that a recipient's response was not clearly unreasonable on a motion to dismiss. *See Davis*, 526 at 649 ("[T]here is no reason why courts, on a *motion to dismiss*, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.") (emphasis added).

In exercising its authority, this Court should find that the Plaintiff's allegations of deliberate indifference fall under the weight of the facts and admissions to the contrary. The Plaintiff acknowledges that SPMS staff responded to the October 4th Incident by holding "an immediate meeting regarding the lack of supervision in the boys' locker room." Opp'n Mem. at

21; Am. Compl. ¶ 24. Likewise, the Plaintiff acknowledges that upon learning of the October 13th Incident, SPMS staff immediately investigated the incident by speaking with members of the football team. Opp'n Mem. at 17-18.[2] The Plaintiff requested a waiver to transfer to another school, and this request was granted. *Id.* at 17. The School Board then held a community meeting to address the issues and concerns relating to the October 13th Incident. *Id.*

In response to these actions, the Plaintiff complains, among other things, about how the investigation was conducted after October 13th and the alleged failure to protect him from harassment following the release of the videos. *Id.* at 17-18. Notably, however, the Plaintiff does *not allege* that he brought any harassment to the attention of anyone at SPMS or the school division or requested any assistance until he sought a waiver. Thus, the Plaintiff cannot point to a single complaint that he made that went unaddressed.

Finally, while acknowledging that SPMS staff attempted to implement a policy requiring supervision of the locker room, the Plaintiff complains that if Bowers and McAuley are not held liable for its implementation the ramifications would be "staggering." Opp'n Mem. at 22. The Plaintiff argues that prison officials could merely write a note to defeat a claim of indifference to a serious medical need. *Id.* This absurd extrapolation fails because nowhere in the Amended Complaint does the Plaintiff allege that Bowers, McAuley, or any other SPMS staff member engaged in a bad faith attempt to feign supervising the locker room with no intent to do so.

---

[2] On page 17 of the Opp'n Mem., the Plaintiff again misstates the allegations contained in the Amended Complaint. Nowhere in the Amended Complaint does the Plaintiff allege that any school official was "joking about the incident," and this characterization in the Plaintiff's brief is not accurate.

II.     **The Plaintiff Fails to State a Claim Under 42 U.S.C. § 1983.**

      A.     **The Plaintiff has alleged neither affirmative acts to support the state-created danger doctrine nor custody to support the special relationship exception.**

The Plaintiff agrees that the failure of government officials "to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989); *see* Opp'n Mem. at 18 ("[I]t has become perhaps axiomatic that instances of private violence do not constitute a violation of the Due Process Clause."). Further, the Plaintiff does not attempt to distinguish (or even cite) *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) (en banc), which remains the leading case in the Fourth Circuit on the state-created danger doctrine. *See Doe v. Rosa*, 795 F.3d 429, 438 (4th Cir. 2015).

Like the plaintiff in *Pinder*, the Plaintiff attempts to characterize his claim as one of affirmative misconduct by emphasizing the "action" of Bowers by informing the Plaintiff's father that the SPMS football players would be supervised in the locker room. The crux of Plaintiff's argument is that Bowers' statement to the Plaintiff's father "nullified" any ability of the Plaintiff or the Plaintiff's father to act on the Plaintiff's behalf, thereby creating a "special relationship." However, the Fourth Circuit in *Pinder* rejected arguments similar to this one as well: "Promises do not create a special relationship — custody does. Unlike custody, a promise of aid does not actually place a person in a dangerous position and then cut off all outside sources of assistance." *Pinder*, 54 F.3d at 1175. As explained in the Memorandum in Support of Defendants' Motion to Dismiss, there is no allegation that Bowers restrained the Plaintiff's liberty in any fashion — even minimally, such as by requiring the student-athletes to change into their safety equipment in the locker room — or prevented the Plaintiff's parents from advising

him in the days following the October 4th Incident as they deemed appropriate. Accordingly, this case falls within the line of opinions holding "uniformly that no special relationship exists because the student is not in physical custody and, along with parental help, is able to care for his basic human needs." *Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25, 30-31 (4th Cir. 2001) (unpublished) (citations omitted). In the absence of even the slightest allegation of custody, the Plaintiff's case is premised on an insufficient allegation of omission. Accordingly, Count I should be dismissed.

### B.    The Plaintiff has failed to state a claim for supervisory liability.

As an initial matter, the Plaintiff's supervisory liability claim requires "a predicate constitutional violation" to proceed. *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012); *see also Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 630–31 (4th Cir. 2002). As noted above, the failure of government officials "to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. The Plaintiff has failed to identify any affirmative conduct by a subordinate of Bowers or McAuley that would support a plausible claim under the state-created danger exception or any custodial relationship that would support a plausible claim under the special relationship exception to the rule of *DeShaney*. The Court should dismiss Count II for this reason alone.

The parties agree that *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) governs supervisory liability in the Fourth Circuit. Under *Shaw*, the first element requires the Plaintiff to plead facts showing "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff." *Id.* at 799. The Plaintiff asks the Court to infer from the meeting following the October 4th Incident that it was not the first incident of its kind and therefore find

13

that Bowers and McAuley had actual or constructive notice of unreasonably risky conduct by their subordinates. The School Defendants do not believe that inference is reasonable. *See Ashcroft,* 556 U.S. at 678. The Plaintiff was a member of the SPMS football team. Am. Compl. ¶ 11. From this fact, the Court can infer that, if the October 4th Incident was not the first incident of its kind, the Plaintiff would have known of any additional prior incidents involving the football team and/or the locker room and detailed those additional prior incidents in the Amended Complaint.

The second element from *Shaw* requires the Plaintiff to plead facts showing that McAuley and Bowers were deliberately indifferent to the offensive conduct of their subordinates. *See Shaw*, 13 F.3d at 799. In the absence of any allegations specifically pertaining to prior instances of subordinates' behavior, the Plaintiff has not plausibly pled that Bowers and McAuley were deliberately indifferent. In *Shaw*, the Fourth Circuit explained that the first and second elements require a plaintiff to demonstrate "widespread" misconduct. *Id.* at 799 n.12 (citing *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). In the Amended Complaint, the Plaintiff sets forth allegations of a single prior incident (the October 4th Incident), which falls short of even the "close case" cited by Plaintiff in support. *See Lee v. Queen Anne's Cty. Office of the Sheriff*, No. RDB-13-672, 2014 U.S. Dist. LEXIS 15225, at *31-34 (D. Md. Feb. 5, 2014) (discussing allegations of three prior instances of misconduct involving five of the supervisor's subordinates and repeated instances of harassment over a two-month period by another subordinate). The Plaintiff has failed to plead facts sufficient to show "widespread" misconduct as needed to plausibly establish either a "pervasive" and "unreasonable" risk of harm or deliberate indifference on the part of Bowers and McAuley.

14

Finally, the third element from *Shaw* requires an "'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (citations omitted). As alleged in the Amended Complaint, Bowers and McAuley met to discuss the October 4th Incident and during that meeting it was agreed that the SPMS football players would be supervised in the locker room. Am. Compl. ¶¶ 23–24. On brief, the Plaintiff appears to contend that the locker room was never supervised, but there are no allegations in the Amended Complaint that the locker room was not supervised after that meeting, except on October 13, 2017. Opp'n Mem. at 22. Likewise, the Plaintiff does not allege in the Amended Complaint that Bowers or McAuley failed to direct their subordinates to supervise the locker room. Nothing in the Amended Complaint links the conduct of Bowers or McAuley to the failure of subordinates to supervise the locker room, and nothing in the Amended Complaint suggests that Bowers or McAuley had notice that their subordinates would fail to supervise the locker room after the meeting. Accordingly, the Plaintiff has failed to plead sufficient facts to establish this element as well.

For all these reasons, Count II of the Amended Complaint should be dismissed.

### III.   The Plaintiff's Claims Under Section 504 of the Rehabilitation Act Fail.

In the Fourth Circuit, claims of disability discrimination under Section 504 "predicated on student-on-student harassment . . . require a showing of deliberate indifference on the part of the funding recipient." *S.B. v. Bd. of Educ.*, 819 F.3d 69, 75 (4th Cir. 2016). The Plaintiff must

> show that he was an individual with a disability, harassed by fellow students based on his disability; that the disability-based harassment was sufficiently 'severe, pervasive, and objectively offensive' that it effectively deprived him of 'access to educational benefits and opportunities' at school . . . and that the school knew about the disability-based student-on-student harassment and was deliberately indifferent to it.

15

*Id.* at 76 (citations omitted). Notably, the Amended Complaint does not contain any facts plausibly suggesting the Plaintiff was harassed by his peers based on his disability, that the Plaintiff even suspected his peers' motivations were related to his disability, or that his peers even knew the Plaintiff had a disability.

The standard stated by the Plaintiff requiring a showing of "bad faith" or "gross misjudgment" set forth in *Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998), is not applicable in this case. The *Sellers* standard does not govern this case because *Sellers* did not involve school liability for student-on-student misconduct. *See S.B.*, 819 F.3d at 75.

Even assuming that the standard from *Sellers* applied, the Plaintiff could not prevail. The Plaintiff asserts on brief that "the Fourth Circuit requires a plaintiff to allege a 'failure to provide the free appropriate education required by the Individuals with Disabilities Education Act,' and either 'bad faith' or 'gross misjudgment' on the part of the school officials." Opp'n Mem. at 24. The Plaintiff does not allege either bad faith or gross misjudgment anywhere in the Amended Complaint. Accordingly, the Plaintiff's allegations of a Section 504 violation do not meet even the erroneous legal standard he posits.

Because the Plaintiff has not alleged any facts to support his claim of disability-based discrimination, Count V of the Amended Complaint should be dismissed.

## IV.    The Plaintiff's State Law Tort Claims Fail.

In the Amended Complaint, the Plaintiff alleges that Bowers and McAuley were grossly negligent and willfully and wantonly negligent in failing to protect the Plaintiff's safety but did not identify the source of any legal duty. Am. Compl. ¶¶105, 119. The Plaintiff has now raised two theories: a duty based on *Burns v. Gagnon*, 283 Va. 657 (2012) and the assumption of a duty

16

to the Plaintiff. Under either theory, both tort claims fail because the October 4th Incident was insufficient to put either defendant on notice of any potential harm to the Plaintiff. In addition, Bowers and McAuley did not assume a duty to ensure the Plaintiff's safety.

### A. The Plaintiff has not identified a generalized common law duty of care.

The Plaintiff claims that *Burns* stands for the proposition that school officials have a generalized duty of care to all students. Opp'n Mem. at 25. That claim is not accurate. In *Burns*, the court recognized that the duty of care set forth in *Kellermann v. McDonough*, 278 Va. 478, 487 (2009), was "applicable here." *Burns*, 283 Va. at 671.

In *Burns*, an assistant principal was informed that a student was going to be involved in a fight that day. In response, the assistant principal stated that he would call security and see that the matter was addressed. *Id.* at 664. Unfortunately, the assistant principal did not alert security or otherwise look into the matter. The student, Gagnon, was subsequently assaulted and injured by another student that day. *Id.*

Based upon these facts, the court recognized that "'when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the *supervising adult* must discharge that duty with reasonable care.'" *Id.* at 671 (citing *Kellermann*, 278 Va. at 487) (emphasis added). The court did not extend the duty to every school official or employee, but specifically limited the duty to a "supervising adult." This language appropriately limits the universe of school employees that can be liable to those actually supervising the child.

In this case, the Plaintiff has not alleged that either Bowers or McAuley were the "supervising adult" during the October 13th Incident. The Plaintiff has not and could not allege that Bowers was even present that day. Likewise, the Plaintiff has not alleged that McAuley had any interaction with the Plaintiff on October 13th or would have been expected to attend football

practice that day. Nor has the Plaintiff alleged that McAuley was forewarned of any wrongdoing to occur on that day. The Plaintiff's unique theory of respondeat superior liability would make principals and vice principals potentially liable for the action or inaction of the teachers actually supervising children simply because they work in the same school. That is not the law of the Commonwealth of Virginia.

### B.  Bowers and McAuley did not assume a duty.

On brief, the Plaintiff also asserts that "Principal McAuley and Coach Bowers expressly promised to supervise the football team while the players were in the locker room at SPMS." Opp'n Mem. at 27. This factual assertion includes no citation. The Amended Complaint states that "Bowers informed DJ's father Mr. Johnson that SPMS football team members would not be left unsupervised in the locker room again." Am. Compl. ¶ 50. Elsewhere, the Amended Complaint states:

> [d]uring a subsequent meeting with the SPMS administration, it was agreed and determined that the SPMS football players were no longer allowed to be in the locker room without adult supervision. Defendant Bowers told Mr. Johnson on the phone and in person that an administrator or a coach would be supervising the locker room at all times.

Am. Compl. ¶ 24. In other words, a management decision was made to supervise the locker room, and that decision was communicated to the Plaintiff's father. There was not an "express[] promise" as the Plaintiff now tries to recast this communication. Indeed, as the Plaintiff described elsewhere on brief, "locker room supervision was not already a normal protocol, would be a novel implementation going forward, and would thus be prone to problems of implementation and execution." Opp'n Mem. at 23. Clearly, the Plaintiff understands that Bowers was sharing a school policy and not making a personal promise.

Finally, nowhere in the Amended Complaint does the Plaintiff allege any direct communication between the Plaintiff's parents and McAuley, much less any express promise from McAuley. That allegation is made for the first time on brief and any claim against McAuley based upon this new theory and new allegation should be dismissed.

### C.  Bowers and McAuley did not breach any alleged duty.

If we assume, for the sake of argument, that Bowers and McAuley assumed the duty that the Plaintiff alleges, we reach absurd results. Bearing in mind that the Plaintiff has not and could not allege that Bowers was even present at SPMS on October 13th, the Plaintiff seeks to hold him liable for the negligence of a subordinate. Such a tort claim lacks any legal precedent in Virginia. The Virginia common law does not recognize that a manager can be liable for the tort of a subordinate.

### D.  No reasonable juror could conclude that Bowers or McAuley were grossly negligent or willfully and wantonly negligent.

Finally, the Plaintiff asks this Court to find gross or willful and wanton negligence based upon the harm caused to the Plaintiff. But under Virginia law, the "scope of the duty and what constitutes negligence is inexorably reined in by what is reasonably foreseeable at the time." *Quisenberry v. Record No. 171494 Huntington Ingalls, Inc.*, 296 Va. 233, 249 (2018). "The existence of a duty to protect against criminal acts of third parties is the exception, and as we have stated, arises only in "'rare circumstances.'" *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 140-141 (2018) (citing *Commonwealth v. Peterson*, 286 Va. 349, 359 (2013)).[3] Without question, the October 13th Incident was outrageous, but it was not foreseeable. Outrage after the fact does not determine the duty of care before the fact.

---

[3] The *Peterson* opinion involves the tragic circumstances at Virginia Tech and provides a thorough and thoughtful review of the authorities on notice and foreseeability.

## CONCLUSION

The School Defendants took no actions that harmed the Plaintiff and did not have notice of ongoing peer-on-peer harassment prior to the October 13th Incident. After the incident, the School Defendants took immediate action, including granting the Plaintiff's waiver request.

WHEREFORE, the School Defendants ask that this court grant their Motion to Dismiss the Amended Complaint for Failure to State a Claim and dismiss the Amended Complaint with prejudice.

Respectfully submitted,

SCHOOL BOARD OF HENRICO COUNTY,
THOMAS MCAULEY & SCOTT BOWERS

By:   /s/_____
          Ryan P. Murphy

Joseph P. Rapisarda, Jr., VSB #14836
     County Attorney
John D. Gilbody, VSB #42788
     Assistant County Attorney
Ryan P. Murphy, VSB #87843
     Assistant County Attorney
Office of the County Attorney
Henrico County
P.O. Box 90775
Henrico, VA 23273-0775
Telephone: (804) 501-4342
Facsimile: (804) 501-4140

*Attorney for Defendants*
*School Board of Henrico County,*
*Thomas McAuley, and Scott Bowers*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on February 6th, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to the following:

Charlotte P. Hodges, Esq.
B.I.G. Legal Services, PLLC
P.O. Box 4302
Midlothian, VA 23112

Mark J. Krudys, Esquire
The Krudys Law Firm
919 East Main Street, Suite 2020
Richmond, VA  23219

           /s/_____
           Ryan P. Murphy