IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

"DJ," A MINOR, BY AND THROUGH
HIS NEXT FRIEND, ROBIN HUGHES, *et al.*,

        Plaintiffs,

v.                                    Civil Action No. 3:19cv905

SCHOOL BOARD OF HENRICO
COUNTY, *et al.*,

        Defendants.

### MEMORANDUM OPINION

Plaintiff "DJ," a minor, brings this civil action by and through his Next Friend and

Mother, Robin Hughes, and his Next Friend and Father, Quentin Johnson (together, "Plaintiffs"),

against the Defendants School Board of Henrico County (the "School Board"), Thomas

McAuley, Scott Bowers, and John Does 1–3 (collectively, "Defendants"). In the Amended

Complaint, Plaintiffs bring seven causes of action. (Am. Compl. 12–23, ECF No. 7.)

Defendants jointly moved to dismiss the Amended Complaint (the "Motion to Dismiss"),

pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF No. 13.) Plaintiffs responded in

opposition, (ECF No. 15), and Defendants replied, (ECF No. 16).

These matters are ripe for adjudication. The Court dispenses with oral argument because

the materials before it adequately present the facts and legal contentions, and argument would

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331(a).[2]

For the reasons that follow, the Court will grant in part and deny in part the Motion to Dismiss.

## I.  Factual and Procedural Background

Plaintiffs bring this civil rights action pursuant to 42 U.S.C. §§ 1983,[3] 1988,[4] and the

Fourteenth Amendment[5] to the United States Constitution.  Plaintiffs assert that this Court has

supplemental jurisdictions over their state law claims.  As explained in more detail below,

Plaintiffs raise seven claims in total, comprised of three claims against the School Board, and

four claims against Bowers, three claims against McAuley, and two claims against John Does in

their individual capacities.

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331(a).  Plaintiffs bring their claims under 42 U.S.C. §§ 1983, 1988 and the Fourteenth Amendment to the Constitution.  (Am. Compl. 3.)

[3] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[4] Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law.  42 U.S.C. § 1983.  Section 1988, titled "Proceedings in vindication of civil rights," directs district courts to exercise jurisdiction over civil and criminal matters alleging violations of civil rights "in conformity with the laws of the United States" and allows for an award of attorney's fees in such actions.  42 U.S.C. § 1988.

[5] The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.

A.    **Factual Background**[6]

Plaintiffs' claims stem from an October 13, 2017 incident at Short Pump Middle School ("SPMS") located in Henrico County, Virginia, during which SPMS football players battered and assaulted Black teammates in the locker room, videotaped the incident, and posted it on social media. (Am. Compl. ¶¶ 25–35.) "DJ was a [twelve]-year-old seventh grader at SPMS and a member of the SPMS football team at the time that the October 13, 2017 incident giving rise to [the] Amended Complaint occurred." (*Id.* ¶ 16.) DJ "was considered 'special needs' and . . . qualified for, and was being educated with, an Individualized Education Plan . . . due to his severe attention deficit hyperactivity disorder (ADHD)." (*Id.* ¶ 11.) At the time of the incident, McAuley "was the principal of SPMS."[7] (*Id.* ¶ 13.) Also at this time, "Bowers was an employee of the School Board and the football coach for SPMS." (*Id.* ¶ 14.) "John Does 1–3 were assistants, employees, coaches, and/or other persons responsible for supervising the SPMS football team players in the boys' locker room on October 13, 2017. . . acting within the course and scope of their employment and/or agency with [the] School Board." (*Id.* ¶ 15.) The School Board oversees SPMS, which receives federal funding. (*Id.* ¶¶ 12, 66, 77.)

---

[6] For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[7] Under Virginia law, a principal is "the instructional leader and manager of the school and is responsible for," among other things, "[f]ostering the success of all students by developing, advocating, and sustaining an academically rigorous, positive, and safe school climate"; "[f]ostering effective human resources management by appropriately assigning, selecting, inducting, supporting, evaluating, and retaining quality instructional and support personnel"; "ensuring that students are provided an opportunity to learn"; and "[i]nvolv[ing] students, staff, parents, and the community to create and sustain a positive, safe, and healthy learning environment that enforces state, division, and local rules, policies, and procedures." 8 Va. Admin. Code § 20-131-210(A)–(B).

3

1.    **On October 4 or 5, 2017, Defendants Became Aware of an Incident in the SPMS Locker Room Involving Bullying and Harassment of Black SPMS Football Players**

Plaintiffs allege that "SPMS officials, including Defendant Bowers, Defendant McAuley, and other unknown SPMS administrators were made aware of a racial incident involving bullying and harassment of the African-American members of the SPMS football team by at least one white football player in the locker room following a game."[8] (*Id.* ¶ 17.) "[O]n or about October 4, 2017, a white player used a racial slur and derogatory language," yelling, among other things, "you n-----s need to run faster!" (*Id.* ¶ 18.) Plaintiffs allege that these comments "were directed at DJ and two other African-American teammates." (*Id.*) "This racially charged harassment and bullying led to a physical altercation **in the locker room** involving the white player and one of DJ's African-American teammates." (*Id.* (emphasis in original).) Plaintiffs aver that the altercation took place on SPMS school property "but no adult was present to supervise the middle school players in the locker room." (*Id.* ¶ 19.)

The next day, on October 5, 2017, Quentin Johnson, DJ's father, informed Bowers, the football coach, via email about the "incident in the locker room involving the racial slur, bullying, harassment, and the subsequent physical altercation." (*Id.* ¶ 20.) That same day, Bowers responded and "acknowledged that he had been made aware of the incident the night before." (*Id.* ¶ 22.) "In his October 5 email response, Defendant Bowers further advised Mr. Johnson that he (Bowers) had taken action and that '[b]eing that this happened on school grounds I have to involve the school.'" (*Id.* ¶ 23.) Bowers informed Mr. Johnson "that a

---

[8] In October 2017, the SPMS football team consisted primarily of white players. (Am. Compl. ¶ 21.) "DJ was one of the three African-American players to whom the racial slurs and derogatory language had been directed." (*Id.* ¶ 21.)

meeting had been set up with the SPMS administration, including the principal, about the matter." (*Id.*)

At a meeting involving SPMS administration, a decision was made that "SPMS football players were no longer allowed to be in the locker room without adult supervision." (*Id.* ¶ 24.) Plaintiffs allege that Bowers "told Mr. Johnson on the phone and in person that an administrator or a coach would be supervising the locker room at all times." (*Id.*) "[E]ight days later, on October 13, 2017, the SPMS football players were once again left unsupervised after school in the boys' locker room for a significant period of time." (*Id.* ¶ 25)

### 2.      On October 13, 2017, Football Teammates Assault and Batter DJ in the Locker Room, Record the Incident, and Post it on Social Media

On October 13, 2017, Plaintiffs allege that non-African-American SPMS football players assaulted and battered DJ while in the locker room without adult supervision. (*Id.* ¶¶ 25–28.) At that time, "DJ was subject to the strictures of his adult supervisors, including that the players wear all equipment required to participate in tackle football." (*Id.* ¶ 25.) Because DJ had "to dress in/out of tackle football equipment before and after games and practice," Plaintiffs allege that "DJ and the two other African-American players [were] in a vulnerable position in the unsupervised boys' locker room." (*Id.*)

"While changing their clothes and preparing for football practice, DJ and two other African-American males on the team were grabbed, forced down, and held against their wills by non-African-American players and subjected to demeaning and traumatizing simulated sex acts, bullying, harassment, racial slurs, ridiculing, and taunting." (*Id.* ¶ 27.) Plaintiffs state that "[i]n one instance, DJ was grabbed and forced to bend over a bench seat while a bigger, stronger, non-African-American player held him down with a forearm to his neck and simulated performing

5

anal sex on him." (*Id.* ¶ 28.) "In another instance, DJ was forced over a bench while another non-African-American player simulated performing a sex act on him from behind." (*Id.* ¶ 29.)

DJ "struggled to be released but was overpowered by the other players," some of whom made insulting comments such as "hey [name], what's up with you and the blacks?; he's f--king a black kid." (*Id.* ¶¶ 30–31.) "DJ yelled and cried for the violent abuse to stop" but it did not. (*Id.* ¶ 31.) When released, "DJ put his school clothes back on and went to the study hall classroom where he knew there was an adult present, and where he felt he would be safe from the actions of his teammates." (*Id.* ¶ 32.) DJ did not return to the locker room to retrieve his other school items until everyone had left, "[n]or did he attend football practice that day." (*Id.* ¶ 33.)

Plaintiffs aver that "[t]he football players involved in the sexual battery and assault videotaped the incident and posted it on social media, adding subtitles and voiceovers that included, among other things, 'There has [sic] been two cases of rape in the short pump boy's lockeroom [sic] today,' '**we gonna f\*\*\* the black outta [sic] these African children from Uganda**,' 'we f\*\*\* every black child in the lockeroom [sic],' and asking '**ever wonder what happens in the football locker room**.'" (*Id.* ¶ 34 (emphases in original).) Plaintiffs claim that "[o]ne comment indicated that a boy forcibly simulating sex acts 'did not have a boner' during the battery, '**so that means I . . . don't actually have a thing for black people**.'" (*Id.* (emphasis in original).) "Hundreds of people saw the video on social media, including . . . the principal of a nearby school who contacted Defendant [McAuley, the principal of SPMS,] to alert him about the video." (*Id.* ¶ 35.)

6

### 3.    After the October 13, 2017 Incident, DJ Suffers Harassment,<br>Experiences Psychological Problems, and Transfers Schools

After the October 13, 2017 incident, students who committed the acts against DJ and other SPMS students who had seen the video "taunted, teased, and humiliated [DJ] about being 'raped' in the locker room." (*Id.* ¶ 36.) Plaintiffs allege that "Defendant Bowers[, the football coach,] sought to minimize and/or dismiss the attacks as 'foolishness' and a 'joke.'" (*Id.* ¶ 37.) "Administrators at SPMS spoke to . . . the football team about the incident on Monday, October 16, 2017 . . . [and told the boys] not to tell anyone about the assault that had taken place that Friday." (*Id.* ¶ 38.)

DJ continued to suffer harassment from other students that "occurred in the halls of SPMS with regularity." (*Id.* ¶ 39.) Following the October 13 incident, "DJ and his African-American teammates were subjected to persistent bullying and harassment from peers, which was both racial and sexual in nature." (*Id.* ¶ 3.) "This would occur in the hallways of SPMS, in plain view of teachers and other SPMS staff." (*Id.*) "One of the [other] boys [who experienced the attack] moved with his parents to another state." (*Id.*)

Plaintiffs allege that despite this regular harassment "no action was taken by any member of the SPMS administration to address it." (*Id.* ¶ 39) "The school environment became so hostile and painful for DJ that his parents requested a waiver for him to attend another school in Henrico County where he could feel safe." (*Id.* ¶ 40.) DJ received the waiver to attend a new school, but "students at [DJ's] new school questioned him about the incident[, which] they had also seen on social media." (*Id.* ¶ 41.) "DJ, a 'special needs' student with an [Individualized Education Program], had difficulty adjusting to his new school environment and routine." (*Id.*)

Plaintiffs aver that "DJ continues to face increased psychological problems as a result of the discrimination, harassment, battery, assault and trauma he suffered at SPMS." (*Id.* ¶ 42.) His

"grades have suffered, he has increased anger, and he shows signs of antisocial behavior at times. [DJ] must see a therapist regularly." (*Id.*)  Plaintiffs claim that "[t]he sexual battery and assault, discrimination on the basis of his race and gender, and the hostile and dangerous school environment to which he has subjected, as well as his sudden and subsequent school change, caused significant complications and disruptions to his learning environment . . . , [which] effectively barred [him] from accessing educational opportunities and benefits at SPMS." (*Id.* ¶ 43.)

### 4.    Plaintiffs Allege McAuley and the School Board Had Prior Knowledge of Pervasive Racism and Bullying at SPMS that Had Not Been Addressed

On October 25, 2017, twelve days after the incident in the locker room, a community meeting occurred during which "the widespread nature of the discrimination and harassment at SPMS, and the knowledge of McAuley and the [School] Board of this fact, was discussed at length." (*Id.* ¶ 44.)  "At that meeting, numerous parents stood to tell stories of racial, sexual, economic, and other forms of discrimination and harassment that their children had suffered while attending SPMS and other [Henrico County Public Schools]." (*Id.* ¶ 45.)  Those same parents stated that "they had gone to Principal McAuley, the School Board, and other members of the administration . . . and other schools, but nothing had changed." (*Id.*)  Other meeting participants claimed that "[w]hen black students are being bullied and sexually harassed, you do nothing." (*Id.* ¶ 46.)  Plaintiffs state that "[a]ccording to news reports on that meeting . . . , Defendant McAuley confirmed that there had been previous incidents of discrimination and harassment at SPMS that, according to him, had been addressed." (*Id.* ¶ 47.)  "No specifics were provided of how these issues purportedly were addressed." (*Id.*)  Plaintiffs note that "simple measures such as ensuring adult supervision in the locker room were not effectively undertaken,

much less widespread policy changes or resource enhancements at SPMS or [Henrico County Public Schools] as a whole to effectively deal with pervasive racism and bullying." (*Id*)

## B.    Procedural Background

On October 15, 2019, Plaintiffs filed suit in the Circuit Court for the County of Henrico. (ECF No. 2.) Defendants timely removed the case to the United States District Court for the Eastern District of Virginia. (*Id*.) Defendants moved to dismiss Plaintiffs' original Complaint and Plaintiffs timely filed an Amended Complaint. (ECF No. 3.) The Amended Complaint superseded the original Complaint and rendered it of no legal effect. (July 1, 2020 Order, ECF No. 19.)

Based on the factual allegations of the Amended Complaint, Plaintiffs bring seven claims against Defendants:

| Count I: | Bowers violated DJ's substantive due process rights to bodily integrity, in violation of 42 U.S.C. § 1983 (the "Substantive Due Process Claim"); |
|---|---|
| Count II: | McAuley and Bowers acted with deliberate indifference to the dangers of the conduct in which their subordinates engaged, in violation of 42 U.S.C. § 1983 (the "Supervisory Liability Claim"); |
| Count III: | The School Board discriminated against DJ on the basis of race, in violation of 42 U.S.C. § 2000d (the "Title VI Claim"); |
| Count IV: | The School Board discriminated against DJ on the basis of sex, in violation of 20 U.S.C. § 1681 (the "Title IX Claim"); |
| Count V: | The School Board discriminated against DJ on the basis of disability in violation of 29 U.S.C. § 794 (the "Rehabilitation Act Claim"); |
| Count VI: | McAuley, Bowers, and John Does 1–3 acted with gross negligence in their actions and inactions, directly and proximately causing DJ harm (the "Gross Negligence Claim"); and, |
| Count VII: | McAuley, Bowers, and John Does 1–3 acted with willful and wanton negligence in their actions and inactions, directly and proximately causing DJ harm (the "Willful Negligence Claim"). |

(Am. Compl. 12–23.) Plaintiffs seek against each of the Defendants, "jointly and severally," $15 million "or in such greater amount to be determined at trial, costs, pre-judgment interest." (*Id.* 24.) Plaintiffs further request $350,000.00 in punitive damages against Defendants McAuley, Bowers, and John Does 1-3 for the state law willful and wanton negligence claims. (*Id.* 24.)

In response to the Amended Complaint, Defendants filed the instant Motion to Dismiss. (ECF No. 13.) Defendants argue that the allegations contained in the Amended Complaint "do not support legal claims for constitutional injuries, deliberate indifference, or negligence. As a matter of law, the theories advanced by the Plaintiff do not render the School Defendant liable for the tortious actions of third parties." (Mem. Supp. Mot. Dismiss 2, ECF No. 14.) Defendants contend that Plaintiffs identify "only a single racial incident that occurred nine days before the October 13th Incident during which the Plaintiff heard a white student use a racial slur and witnessed a fight between that white student and an African American student. [DJ] was not involved in the fight." (*Id.*) As a result, Defendants contend that "[n]othing up to [the October 13, 2017 incident] had given any of the School Defendants notice that such behavior was likely or even possible." (*Id.* 3.) Plaintiffs responded and Defendants replied. The Court turns now to the merits of the pending Motion to Dismiss.

## II. Standard of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain

sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and "requires the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

11

### III. Analysis

The Court first evaluates Defendants' assertion that Plaintiffs have not stated a claim

arising under Federal law (Counts I through V). The Court then assesses the supplemental state

law claims (Counts VI and VII). Because the Court finds that the Amended Complaint raises

claims that generally require fact-specific inquiries, the Court will allow Counts I–IV and VI–VII

to proceed past the pleadings stage. This will allow the Parties to develop a record to better

substantiate their claims or applicable defenses.

### A. Because Bowers May Have Increased the Risk of the Students in the Locker Room, Plaintiffs Allege a Substantive Due Process Claim Based on a Violation of Bodily Integrity in Count I

Plaintiffs allege that Bowers, the football coach, "[t]hrough his actions and omissions, . . .

and while acting under color of state law, and in his individual capacity," violated DJ's

substantive due process rights to bodily integrity that the Fourteenth Amendment guarantees.

(Am. Compl. ¶ 49.) Plaintiffs aver that "[a]fter the incident in the locker room on or about

October 4, 2017, Defendant Bowers informed DJ's father . . . that SPMS football team members

would not be left unsupervised in the locker room again." (*Id.* ¶ 50.) Plaintiffs claim that based

on this assurance, DJ's parents took no "further action themselves to protect DJ." (*Id.* ¶ 51.)

Defendants move to dismiss the Substantive Due Process Claim, stating that Plaintiffs

failed to allege that "Bowers engaged in any affirmative or deliberate conduct that resulted in the

alleged violation of this substantive due process right." (Mem. Supp. Mot. Dismiss 8.)

Defendants assert that Bowers did not "create" or "increase" "the alleged danger of peer-on-peer

harassment by requiring that student–athletes practicing for tackle football wear safety

equipment for tackle football." (*Id.* 10.) Defendants further argue that Plaintiffs have not

12

alleged that "Bowers did anything to instigate the October 13th Incident," and that he "did not intentionally or recklessly contribute to the violence." (*Id.* 12.)

### 1.    Legal Standard:  Substantive Due Process

Section 1983 imposes liability on state actors who cause the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "To succeed on a § 1983 claim, a plaintiff must prove by a preponderance of the evidence that: (1) the defendant engaged in conduct which deprived plaintiff of a federal constitutional or statutory right, (2) that the defendant was acting under color of law, and (3) that the acts of that defendant proximately caused the plaintiff's damages." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 747 (E.D. Va. 2016) (citing *Amato v. City of Richmond*, 875 F. Supp. 1124, 1132–33 (E.D. Va. 1994)).

"Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity." *Doe v. Rosa*, 795 F.3d 429, 436–37 (4th Cir. 2015). But the Substantive Due Process right to bodily integrity has limits. The Supreme Court of the United States has affirmed that the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). And "because 'the Due Process Clause does not require the State to provide its citizens with particular protective services, [state actors] cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.'" *Doe*, 795 F.3d at 437 (quoting *DeShaney,* 489 U.S. at 196–97). *Deshaney* directs that instances of private conduct usually do not constitute a violation

`

13

of the Due Process Clause.[9]  489 U.S. at 197.  But two exceptions exist to this rule:  the state-created danger and special relationship doctrines.[10]  *Rosa*, 795 F.3d at 437–38.

### a.    State-Created Danger Doctrine

The state-created danger doctrine comprises the first exception to the rule that instances of third-party private conduct generally do not violate the Due Process Clause.[11]  The Fourth Circuit has explained that "to establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Id.* at 439.  Put another way, "state actors may not disclaim liability when they themselves throw others to the

---

[9] The Court bears in mind that in the Due Process context, the Supreme Court has cautioned that the "[r]ules of due process are not . . . subject to mechanical application." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *see also Collins v. City of Harker Heights*, 503 U.S. 115 (1992) (stating that Section 1983 was not intended to turn every tort claim into a constitutional violation or to serve as a "guarantee against incorrect or ill-advised personnel decisions"). *Lewis* and its progeny shed light on the Supreme Court's view that, at least in some cases, reckless or deliberately indifferent government action may be arbitrary and egregious in a constitutional sense and thus provide grounds for a viable Due Process claim.

Indeed, the Supreme Court observed in *Lewis* that cases "falling within the middle range, following from something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls,'" 523 U.S. at 849 (citation and footnote omitted), and made clear that, under some circumstances, "deliberate indifference" could shock the conscience, *see id.* at 849–50 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . . "). In distinguishing between these more difficult, middle-ground cases, the Supreme Court counseled judicial discretion and warned that courts should engage in an "exact analysis of circumstances" rather than "mechanical application" of predetermined rules. *Id.*

[10] As the Fourth Circuit has aptly explained, "where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct exception." *Waybright v. Frederick Cty.*, 528 F.3d 199, 205 (4th Cir. 2008).

[11] Plaintiffs appear to argue that their allegations implicate both doctrines: "when assurances of protection are made by a school official to the guardian of a student that prevent that guardian from taking actions to care for the child, then the state has created a special relationship in that instance." (Resp. Mot. Dismiss 18, ECF No. 15.)

lions," but that does not "entitle persons who rely on promises of aid to some greater degree of protection from lions at large." *Id.*

For example, the Supreme Court held in *DeShaney* that a county social services department had not violated a four-year-old's substantive due process rights by failing to protect the child from his abusive father after the child suffered harm at the hands of his father. 489 U.S. at 191–94. The department had received numerous reports of abuse but failed to remove the child from his father's custody. *Id.* at 192–93. The Supreme Court concluded that although "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection" based on a "special relationship," no such relationship existed in *DeShaney* because the child was not in the State's custody (e.g., through "incarceration, institutionalization, or other similar restraint of personal liberty") when his father harmed him. *Id.* at 197–200. As part of its Due Process analysis, the Supreme Court observed that the department was also not liable because, "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

The Fourth Circuit has also directed that "to establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created *or increased the risk* of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Rosa*, 795 F.3d at 439 (emphasis added); *accord Robinson v. Lioi*, 536 F. App'x 340, 343–44 (4th Cir. 2013) ("[T]he state-created danger exception is a narrow one and . . . for the doctrine to apply, there must be affirmative action, not inaction, on the part of the State which creates or increases the risk that the plaintiff will be harmed by a private actor.").

Relevant here, "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive." *Rosa*, 795 F.3d at 438 (internal quotation marks and citation omitted).[12] But the Supreme Court has recognized that in an educational setting a school may exercise significant control over a harasser. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646 (1999) (discussing supervisory relationship of schools in Title IX context). In one case involving student athletes, the Supreme Court discussed how "the nature of [the State's] power [over public schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults."[13] *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (analyzing privacy expectations in the context of school sports). On more than one occasion, the Supreme Court has recognized the importance of school officials' "comprehensive authority . . . , consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (analyzing school children's First Amendment rights); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 9 (1985) ("The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing

---

[12] Of course, a school's custodial relationship does not mirror that of incarceration or civil commitment, *DeShaney*, 489 U.S. at 197-200, but the absence of a custodial relationship does not itself defeat such Due Process claims. *Rosa*, 795 F.3d at 438.

[13] To be sure, the *Vernonia* Court repeatedly emphasized that a minor's rights "vis-a-vis the State may depend on the individual's legal relationship with the State" and that "central" to the Court's decision was the fact that the children claiming a constitutional privacy right had "been committed to the temporary custody of the State as schoolmaster." *See* 515 U.S. at 654; *see also id.* at 655, 656, 662, 665.

16

other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities.").[14]

   This does not mean that the school relationship, without more, triggers the constitutional duty to protect; otherwise every decision by school officials might result in a due process violation. *See generally Rosa*, 795 F.3d at 439 (discussing state-created danger doctrine). Rather, the circumstances of a specific claim must be considered at the pleadings stage when assessing state-created danger claims. *Iqbal*, 556 U.S. at 678–79.

### b.    <u>Special Relationship Doctrine</u>

   The special relationship doctrine is the second exception to the rule that third-party private conduct generally does not violate the Due Process Clause. As to the special relationship doctrine, the Fourth Circuit has recognized that when the state is in a special relationship with a private individual, "it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard," which may result in finding a due process violation. *Waybright v. Frederick Cty.*, 528 F.3d 199, 207 (4th Cir. 2008). A "'special relationship' is all but synonymous with a custodial relationship." *Id.* (citing *Deshaney*, 489 U.S.

---

[14] Recognizing that due process rules are not subject to mechanical application, as explained in *Lewis*, 523 U.S. at 850, the Court sees that in many circumstances such as those referenced above, the law establishes a continuum of restrictions that the State should impose on a private citizen to trigger a special relationship, the degree of which corresponds to the age and competency of the individual in question, *i.e.*, his or her mental, psychological, and physical ability to recognize and defend him or herself against threats to personal safety. When an otherwise capable and competent adult is so deprived, the State has a duty to provide him or her with such care and security as is necessary. *Deshaney*, 489 U.S. at 198–99 ("[B]ecause the prisoner is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him.") (citation omitted).

   It seems that a child's age or capacities should also play a role in evaluating the factual circumstances of a claim like the one at bar. While the Court acknowledges that the school relationship does not *ipso facto* create a special relationship for due process purposes, common sense also dictates that elementary school students are significantly distinct from middle school and high school students. Certainly, a six-year-old kindergartener cannot look after himself or herself in the same manner as a seventeen-year-old high school student.

at 199–200).  The requirement that a State affirmatively act for the safety of a private individual

in these contexts is grounded on the premise that by taking custody of a person, the state has

denied that individual the opportunity to provide for his or her own needs.  *Deshaney*, 489 U.S.

at 199–200.  According to the Supreme Court,

> when the State by the affirmative exercise of its power so restrains an individual's
> liberty that it renders him unable to care for himself, and at the same time fails to
> provide for his basic human needs - e. g., food, clothing, shelter, medical care, and
> reasonable safety - it transgresses the substantive limits on state action set by . . .
> the Due Process Clause.

*Id.* at 200.  The Fourth Circuit has held that this type of special relationship based on custody

comes about in factual situations such as "incarceration, institutionalization, or the like."  *Pinder*

*v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995) (*en banc*).  The affirmative duty to protect does

not arise merely "from the State's knowledge of the individual's predicament or from its

expressions of intent to help him [or her], but from the limitation which it has imposed on his [or

her] freedom to act on his [or her] own behalf."  *Id.* (quoting *Deshaney*, 489 U.S. at 200).

   The Fourth Circuit, in an unpublished decision, has expressed its inclination to join other

circuits in finding that the relationship between the school and the student generally does not

create a special relationship sufficient to trigger the substantive protections of the Due Process

Clause.  *See Stevenson v. Martin Cty. Bd. Of Educ.*, 3 F. App'x 25, 31 (4th Cir. 2001)

(unpublished) (holding that because "[a]ttending school is not the equivalent of incarceration or

institutionalization," no special relationship forms between a student and a public school that

implicates the Due Process Clause); *see also B.M.H. v. Sch. Bd. of City of Chesapeake*, 833 F.

Supp. 560, 571 (E.D. Va. 1993) ("Even if public schools have some duty under state law to

protect students, that is not enough to place the affirmative burdens of the Fourteenth

Amendment Due Process Clause upon teachers, principals, and administrators to protect each

18

child from possible harm by third parties."). With these legal standards in mind, the Court turns

now to the allegations in the Amended Complaint.

> **2.     Plaintiffs Satisfy the Elements of a Substantive Due Process Claim Against Bowers Based on a Violation of Bodily Integrity under the State-Created Danger Doctrine**

At this procedural posture and taking the allegations in the Amended Complaint as true,

Plaintiffs have satisfied the elements of a Substantive Due Process Claim based on the right to

bodily integrity in accordance with the state-created danger doctrine. While perhaps a close call,

the Court notes that Plaintiffs have alleged that Bowers "*increased the risk* of private danger" by

failing to have adult supervision in the locker room after assuring parents that supervision would

occur following a similar incident in the locker room roughly one week before DJ suffered

injury. *See Rosa*, 795 F.3d at 439. The similarity of the incidents, the temporal proximity of the

incidents, the requirements to have students dress for practice together in the locker rooms, the

affirmative assurances of Bowers—the SPMS football coach—to have adult supervision over the

minor children in the locker room, and the failure to implement supervision are enough to allow

this claim to proceed past the Motion to Dismiss stage. Bowers' dismissal of the second incident

as "foolishness" or a "joke" also contributed to DJ's inability to get relief from any bullying.

Defendants counter that Plaintiffs fail to allege a Substantive Due Process claim because

the allegations are "legally indistinguishable from the facts of *Pinder*." (Mem. Supp. Mot.

Dismiss 11.) In *Pinder v. Johnson,* the Fourth Circuit analyzed *en banc* the duty of a state to

protect its citizens from dangers posed by private actors. 54 F.3d 1169. *Pinder* involved

"genuinely tragic" facts. *Id.* at 1172. The defendant, Officer Donald Johnson, responded to a

call reporting a domestic disturbance at the home of the plaintiff, Carol Pinder, where Johnson

arrested Pinder's ex-boyfriend. *Id.* The ex-boyfriend had just been released from prison after

serving a ten-month sentence for attempted arson of Pinder's home and returned to her residence, making similar threats. *Id.* Despite Officer Johnson's assurances to Pinder that she could safely leave her children home alone and go to work because her ex-boyfriend would be incarcerated overnight, the ex-boyfriend was, in fact, charged only with a misdemeanor and released shortly thereafter. *Id.* After his release from custody, the ex-boyfriend returned to Pinder's home and set it ablaze. *Id.* Pinder was not present because she had relied on the officer's assurances and returned to work. Her three children were at home and all died in the fire. *Id.*

In a fractured opinion,[15] the Fourth Circuit found that Pinder could not allege a Substantive Due Process claim against Officer Johnson under the facts of that case because he had not created the danger. As the Fourth Circuit evaluated Pinder's claim under the qualified immunity doctrine, it observed that Pinder brought "purely an omission claim" after she argued that a police officer had affirmatively acted to enhance the danger posed by her ex-boyfriend when the officer reassured her that the ex-boyfriend would be "locked up overnight," but then decided to charge the ex-boyfriend with less serious offenses that resulted in his immediate release and took him to a commissioner despite telling Pinder one would not be available overnight. *Id.* at 1172, 1176, 1180–81. In finding that Pinder had not alleged a violation of any clearly established right, the Fourth Circuit explained that "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by" the ex-boyfriend, not by the officer. *Id.* at 1175. "[T]he state did not 'create' the danger, it simply failed to provide adequate protection from it," meaning that, at most, the state actors "stood by and did nothing when suspicious circumstances dictated a more active role." *Id.* (internal quotation marks omitted).

---

[15] The *en banc* Court produced five different opinions: a majority, three concurrences, and a dissent that four of the appellate judges joined. *See Pinder*, 54 F.3d 1169, 1171.

20

The Court finds the instant case distinguishable from *Pinder* for two reasons:
(1) differing factual circumstances are presented here; and, (2) this case comes to the Court at an earlier procedural posture. First, this case is factually distinct from *Pinder*. Here, Plaintiffs allege that Defendants, including Bowers, knew about widespread and pervasive bullying at SPMS, including an incident of the same nature in the SPMS locker room roughly one week before the October 13, 2017 incident. Specifically, Plaintiffs allege that Bowers promised to act (ensuring adult supervision), in response to an incident that occurred on school grounds (in the locker room), involving members of his middle school football team, after a similar incident occurred roughly one week prior in the same location. At all times, the SPMS football players, both the assaulters and the victims, were in the temporary control or purported supervision of Defendants. In contrast, the injuries in *Pinder* occurred at a private residence and the omission—the release of the ex-boyfriend—took place at a different location. 54 F.3d at 1172, 1175. Also, the Court can reasonably infer Bowers had authority to require supervision in the locker room while the officer in *Pinder* had no control over the commissioner's decision. While this certainly does not mean that *any* injury that occurs on school grounds may lead to liability, *Stevenson,* 3 F. App'x at 31 ("the state, simply by virtue of its maintenance of a public school system, does not become constitutionally liable for failing to prevent all student-on-student violence"), the facts showing when, where, and how the event occurred here materially distinguish it from *Pinder*.

Second, *Pinder* considered plaintiff's claim at the motion for summary judgment stage, which courts resolve after allowing the parties to engage in discovery and develop a record. Indeed, the *Pinder* Court recognized that "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury," the distinction between *state action* and *state omission* blurs,

making it difficult to determine the state's role in creating the dangerous situation *without examining the factual circumstances* of the case. 54 F.3d at 1177. And the Fourth Circuit subsequently explained in *Rosa*, also at the summary judgment stage, that courts may consider whether a defendant *increased the risk* of private danger and did so directly. 795 F.3d at 439.

Based on the allegations in the Amended Complaint and because deciding Plaintiffs' claim requires an examination of the factual circumstances before the Court, the Court concludes that Plaintiffs must be given an opportunity, through discovery and other pretrial devices, to delve into the circumstances of this case to determine whether Bowers's acts, omissions, or assurances are sufficient to impose liability. The Court recognizes that the state-created danger doctrine represents a narrow exception to the rule pronounced in *DeShaney* and Plaintiffs' Substantive Due Process claim may not fall within its limited boundaries. *See Pinder*, 54 F.3d at 1172, 1175 (finding no affirmative act when officer failed to charge petitioner's ex-boyfriend with a more serious crime); *see also Rosa*, 795 F.3d at 431, 439 (concluding that no affirmative act created danger when college president who lacked details of events failed to report child abuse to law enforcement). At a later stage in the litigation, this claim may ultimately fall in line with *Pinder* and *Rosa*, meaning Plaintiffs' Substantive Due Process claim against Bowers could fail. But at this procedural posture, Plaintiffs raise factual allegations relevant to Bowers— including knowledge about a prior incident, his oversight of the students on the middle school football team, his minimizing of events when addressing the team, and his conversations with DJ's parents regarding protections that would be put in place to prevent similar occurrences in the locker room—before DJ's assault and battery occurred in the SPMS locker room that may give rise to a Substantive Due Process claim.

Therefore, at this stage of the litigation, the Court will deny the Motion to Dismiss as to the Substantive Due Process claim against Bowers in Count I.

**B.      Because Plaintiffs' Allegations Meet Each of the Elements of a Supervisory Liability Claim, Plaintiffs Allege a Claim of Supervisory Liability Against McAuley and Bowers Based on Deliberate Indifference in Count II**

In Count II, Plaintiffs allege that McAuley, the principal of SPMS, and Bowers, the football coach, had actual or constructive knowledge that their subordinates engaged in conduct that posed a pervasive and unreasonable risk of injury to students such as DJ by leaving them unsupervised in the locker room, meaning their deliberate indifference renders them liable under a theory of supervisory liability. Plaintiffs aver that one week prior to "the incident giving rise to this Amended Complaint, SPMS officials, including [Bowers and McAuley], were made aware of" a racial incident involving bullying in the locker room. (Am. Compl. ¶ 17.) Plaintiffs further allege that during an October 25, 2017 community meeting, parents and students discussed "the widespread nature of the discrimination and harassment at SPMS" and related complaints that were made known to Defendants. (*Id.* ¶ 44.) Plaintiffs contend that because McAuley and Bowers had knowledge of racism and bullying at SPMS, including the previous incident in the locker room, their actions show deliberate indifference and provide an "affirmative causal link" to the injuries DJ suffered. (*Id.* ¶ 61.)

In response, Defendants contend that the "single incident [before October 13th] does not support even an inference that there was a pervasive problem—much less that Bowers and McAuley knew or should have known of a pervasive problem." (Mem. Supp. Mot. Dismiss 14.) Defendants further state that Plaintiffs have not alleged supervisory liability because "[e]ven if the decision to require constant supervision of the locker room was not successfully implemented, it demonstrated diligence to overcome a claim of deliberate indifference." (*Id.*)

## 1.    Legal Standard: Supervisory Liability

The "doctrine of *respondeat superior* has no applicability to § 1983 claims." *Harbeck v.*

*Smith*, 814 F. Supp. 2d 608, 626 (E.D. Va. 2011) (citing *Love-Lane v. Martin*, 355 F.3d 766, 782

(4th Cir. 2004)).  "Given that limitation, supervisors can be held liable 'in their individual

capacities only for their personal wrongdoing or supervisory actions that violated constitutional

norms.'" *Id.* at 626–27 (quoting *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x

279, 282 (4th Cir. 2009)).

In order to establish supervisory liability under § 1983, a plaintiff must demonstrate:

(1) that the supervisor had actual or constructive knowledge that his subordinate
was engaged in conduct that posed a pervasive and unreasonable risk of
constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
to that knowledge was so inadequate as to show deliberate indifference to or tacit
authorization of the alleged offensive practices [ ]; and (3) that there was an
affirmative causal link between the supervisor's inaction and the particular
constitutional injury suffered by the plaintiff.

*Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799

(4th Cir. 1994)).

The first element, which involves actual or constructive knowledge, can be satisfied by

showing: "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where

the conduct poses a pervasive and unreasonable risk of constitutional injury." *Shaw*, 13 F.3d at

799 (citations omitted).  "Establishing a 'pervasive' and 'unreasonable' risk of harm requires

evidence that the conduct is widespread, or at least has been used on several different occasions

and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of

constitutional injury." *Id.* (citations omitted).

The second element requires the plaintiff to show "deliberate indifference to or tacit

authorization of the alleged offensive practices." *Baynard*, 268 F.3d at 235.  A plaintiff may

24

establish deliberate indifference by "demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Shaw*, 13 F.3d at 799 (citations omitted). Establishing deliberate indifference involves carrying "a heavy burden of proof" because deliberate indifference cannot be established by "pointing to a single incident or isolated incidents." *Id.* To hold a supervisor liable under a tacit authorization theory requires pleading facts supporting the inference that the "supervisor fail[ed] to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place." *Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014) (citation omitted). Furthermore, the standard for establishing deliberate indifference recognizes that a supervisor cannot "reasonably be expected to guard against the deliberate criminal acts of . . . properly trained employees [with] no basis upon which to anticipate the misconduct." *Shaw*, 13 F.3d at 799 (citation omitted). "[A] supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted." *Baynard*, 268 F.3d at 236. Deliberate indifference cases may present on a sliding scale and involve conduct that appears as "something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Lewis,* 523 U.S. at 849 (internal quotation marks, citation, and footnote omitted). As the Supreme Court has explained, in certain circumstances, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Id.* at 850.

Finally, the third element requires a demonstration of causation. A plaintiff can show causation by demonstrating "an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (citation omitted). "This concept encompasses cause in fact and proximate cause . . . [and] 'may be supplied by [the] tort principle

that holds a person liable for the natural consequences of his [or her] actions.'" *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984)).

> ### 2. Taking the Well-Pleaded Factual Allegations in the Complaint as True, Plaintiffs Satisfy the Three Elements for Supervisory Liability

At this procedural posture, Plaintiffs have pleaded sufficient facts to state a supervisory liability claim against McAuley and Bowers because they plausibly meet all four elements of a supervisory liability claim.

Regarding the first element, actual or constructive knowledge, Plaintiffs have alleged that McAuley and Bowers knew, or should have known, that pervasive bullying existed at SPMS and that their subordinates' conduct posed an unreasonable risk of injury. Although Defendants allege that a single incident in the locker room one week before DJ suffered his injuries could not sufficiently put McAuley and Bowers on notice, the Amended Complaint does not rest solely on that allegation. Rather, the Amended Complaint describes an atmosphere of widespread bullying at SPMS. Additionally, Plaintiffs describe an October 25, 2017 community meeting, during which many participants spoke about the environment at SPMS and Henrico County Schools, and McAuley's prior knowledge of the persistent harassment. Plaintiffs also correctly note that at the Motion to Dismiss stage, "the Court may infer from the fact that Bowers and McAuley (along with other SPMS administrators) had an immediate meeting regarding the lack of supervision in the boys' locker room that the October 4 incident was not the first of its kind." (Resp. Mot. Dismiss 21). These facts satisfy the first element of a supervisory liability claim at the Motion to Dismiss stage.

Regarding the second element, deliberate indifference, Plaintiffs have alleged that McAuley and Bowers exhibited deliberate indifference by failing to ensure adult supervision of the SPMS locker room despite knowledge of bullying and harassment. Taking the well-pleaded

26

factual allegations as true and making all reasonable inferences in favor of Plaintiffs, one could reasonably infer that McAuley's and Bowers's failure to respond to mounting evidence of potential misconduct in the locker room exhibited deliberate indifference.  Defendants' argument that Plaintiffs' failure to "allege that the white student involved in the October 4th incident was involved in the October 13th incident or that he was even still a member of the football team at that time" does not persuade.  (Mem. Supp. Mot. Dismiss 5.)  A favorable reading of Plaintiffs' claim might create the reasonable inference that the bullying went beyond that one student. Indeed, it is alleged that multiple students committed the assault here.

Defendants also argue that "[e]ven if the decision to require constant supervision of the locker room was not successfully implemented, it demonstrated sufficient diligence to overcome a claim of deliberate indifference," (Mem. Supp. Mot. Dismiss 14), but that argument cannot prevail either.  As Plaintiffs observe, at this stage of the litigation, "McAuley and Bowers cannot hide behind their determination that SPMS football players were to be supervised in the boys' locker room, if there is *no evidence that such supervision occurred*."  (Resp. Mot. Dismiss 22.) Without further development of the record, the Court cannot conclude at this stage that McAuley and Bowers acted diligently in response to a known pattern of comparable conduct.  Therefore, Plaintiffs meet the second element of a supervisory liability claim.

Regarding the third element, causation, Plaintiffs allege that McAuley's and Bowers's failure to ensure proper supervision of the locker room proximately resulted in DJ's injuries.  To that end, the brief time lapse between incidents, the assurance of adult supervision, and the resulting harm DJ suffered satisfy the causation element.  Because Plaintiffs meet all elements of a supervisory liability claim, at this stage of the litigation, the Court will deny Defendants' Motion to Dismiss the Supervisory Liability Claim in Count II.

C.     **Because Plaintiffs' Allegations Meet Each Element of a Title VI (Race Discrimination) and Title IX (Sex Discrimination) Claim, Plaintiffs Allege a Viable Title VI and Title IX Claim Against the School Board in Counts III and IV**

Relevant to the Title VI and Title IX claims, Plaintiffs allege that SPMS receives federal funding, and received federal funding at all times relevant to the case at bar. Plaintiffs further allege for their Title VI claim that "racial discrimination had persisted at SPMS . . . for a lengthy period of time," and that Defendants exhibited deliberate indifference in their lack of reaction to this racial harassment. (Am. Compl. ¶ 67.) Plaintiffs similarly aver for their Title IX claim that the School Board, McAuley, and Bowers had actual knowledge of peer-to-peer sexual harassment and point to factual allegations supporting this claim, and that Defendants exhibited deliberate indifference in their lack of reaction to this sexual harassment. (*Id.* ¶¶ 80, 81.)

In response, Defendants contend that Plaintiffs have not alleged facts showing actual notice by the School Board of ongoing racial or sexual harassment prior to or after the October 13th incident. (Mem. Supp. Mot. Dismiss 17.) Defendants state that Plaintiffs also failed "to create the plausible inference that the School Board made a decision to remain idle in the face of known student-on-student harassment or that there was no attempt to remedy such harassment." (*Id.* 18.) Defendants point to the meetings that were set up about the October 4 locker room incident, the decision to supervise students in the locker room, speaking to the football team, and hosting a community meeting on October 25 as allegations that show the School Board did not act unreasonably or with deliberate indifference. (*Id.* 19.)

1.     **Legal Standard: Title VI and Title IX Discrimination Claims**

Plaintiffs bring their race discrimination and sex discrimination claims under Title VI and Title IX, respectively. "The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to

28

a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Here, the Parties agree that Title VI and Title IX employ the same deliberate indifference standard. (Mem. Supp. Mot. Dismiss 16; Resp. Mot. Dismiss 6.)

Title VI states, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title IX similarly states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

To state a claim under Title VI or IX, Plaintiffs must demonstrate "that (1) [he or] she was a student at an educational institution receiving federal funds, (2) [he or] she was subjected to harassment based on [his or] her sex [or race], (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution."[16] *Jennings v. Univ. of N. Carolina*,

---

[16] "[T]he proper defendant in a Title VI case is an entity rather than an individual." *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 844 (D.S.C. 2015). Specifically, a plaintiff may sue a school for monetary damages for its failure to address a racially hostile environment. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 n.5 (3d Cir. 2001) (suggesting that Title VI hostile environment claims may lie when a plaintiff brings a suit against a school); *see also Bryant v. Indep. Sch. Dist. No. I–38*, 334 F.3d 928, 933–34 (10th Cir. 2003) (holding that when administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable).

Similarly, the Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded educational institution for a violation of Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979). More than twenty years ago, in *Davis v. Monroe County Board of Education*, the Supreme Court explained that student-on-student sexual harassment may constitute "discrimination" within the meaning of Title IX. 526 U.S. 629, 649–50 (1999).

482 F.3d 686, 695 (4th Cir. 2007); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (internal quotation marks and citation omitted) (accord). "An educational institution can only be liable for student-on-student sexual harassment, however, when the institution exercises substantial control over both the harasser and the context in which the known harassment occurs." *Feminist Majority Found.*, 911 F.3d at 686 (internal quotation marks and citation omitted). Where, as here, the misconduct occurs during school hours and on school grounds, that misconduct is taking place under an operation of the funding recipient. *Davis*, 526 U.S. at 646 (citation omitted). The Supreme Court has noted that "[i]n these circumstances, the recipient retains substantial control over the context in which the harassment occurs. More importantly, however, in this setting the Board exercises significant control over the harasser." *Id.* at 646.

Courts have recognized that for Title VI race discrimination and Title IX sex discrimination claims, actionable harassment deprives the victim of equal access to the school's educational opportunities and has a "systemic effect on educational programs or activities." *Davis*, 526 U.S. at 653. The harassment must be "severe, pervasive, and objectively offensive," and rise above the level of "simple acts of teasing and name-calling among school children . . . even where these comments target differences in [race or sex]." *Id.* at 652. To that end, racial or sexual harassment can be said to deprive a student of access to educational opportunities or benefits in several circumstances, including when the harassment: (1) results in the physical exclusion of the victim from an educational program or activity; (2) "so undermines and detracts from the victim['s] educational experience" as to "effectively den[y him or her] equal access to an institution's resources and opportunities;" or, (3) has "a concrete, negative effect on [the victim's] ability" to participate in an educational program or activity. *Id.* at 650–51, 654.

Under this rubric, a plaintiff may recover for alleged "severe, pervasive, and objectively offensive" student-on-student harassment if the school "acts with deliberate indifference to known acts of harassment." *Davis*, 526 U.S. at 633. Therefore, a school may be held liable for a Title VI or Title IX claim of student-on-student discrimination only when the school's response is "clearly unreasonable in light of the known circumstances." *Id.* at 648.

Regarding whether a basis for imputing liability exists based on a school's response to harassment, the Fourth Circuit recently discussed in *Feminist Majority Foundation v. Hurley* both the knowledge of administrators and remedial measures sufficient to overcome the deliberate indifference standard for a Title IX claim. 911 F.3d at 688. In that case, the Fourth Circuit reiterated that a school may not be held liable under Title IX for what its students do, but only for what is effectively an official decision by the school not to remedy student-on-student harassment. *Id.* Thus, because administrators are entitled to "substantial deference" in how they choose to address student-on-student harassment, *S.B.*, 819 F.3d at 77, schools are "not normally liable for failing to cede to a harassment victim's specific remedial demands," *Feminist Majority*, 911 F.3d at 686.

This deference is not absolute, however. A school still violates Title IX "when [its] response—or lack thereof—to known student-on-student sexual harassment is 'clearly unreasonable'" in light of the circumstances. *Id.* (quoting *Davis*, 526 U.S. at 648). For instance, deliberate indifference may be shown "where [a] school 'dragged its feet' before implementing 'little more than half-hearted measures'" to curb known harassment. *See S.B.*, 819 F.3d at 77 (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–70 (2d Cir. 2012) ("Responses that are not reasonably calculated to end harassment are inadequate.")). In *Feminist Majority*, the Fourth Circuit described how the plaintiffs had alleged "repeated instances of [university]

31

students targeting and harassing Feminists United members with threats and other sex-based

hostility." 911 F.3d at 689. The Fourth Circuit faulted the university administrators for their

unreasonable response because they "merely responded with two listening circles, a generic

email, and by sending a campus police officer with a threatened student on one evening after

particularly aggressive and targeted" threat.[17]  *Id.*  As a result, the Fourth Circuit allowed the

---

[17] Plaintiffs in *Feminist Majority* were members of an organization called Feminists
United at the University of Mary Washington ("UMW"). 911 F.3d at 680. Plaintiffs alleged that
they began experiencing virtually constant harassment by UMW students from November 2014
through the "summer" of 2015. *Id.* at 680–84. The harassment included "strong criticism of
Feminists United and its members" expressed in "offensive terms" over a social media site called
"Yik Yak;" students "screaming" obscenities at Feminists United members as they walked home,
such as "F[***] the feminists;" "verbal assaults and cyber-attacks on members" after a member
complained about the men's rugby team performing a chant that "glorified violence against
women, including rape and necrophilia;" "derogatory, sexist, and threatening" comments posted
to the school newspaper's website; threatening physical encounters between members of the
Feminist Majority and the men's rugby team; "threats of physical and sexual violence" posted on
Yik Yak, including, "Gonna tie the feminists to the radiator and [g]rape them in the mouth,"
"Dandy's about to kill a bitch. . . or two," and "Can we euthanize who ever caused this
bullshit?"; social media posts that referred to members as "femicunts, feminazies, cunts, bitches,
hoes and dikes;" and social media posts detailing the schedule of a member so that students
would know where to find her to her confront her personally. *Id.* In total, plaintiffs alleged over
700 threatening and harassing Yik Yak posts in addition to the in-person comments and threats.
*Id.* at 683.
    After plaintiffs complained to UMW officials, a UMW professor held two "listening
circles" at which Feminists United members could tell faculty how the harassing posts affected
them; held an "open forum" at which UMW President Hurley "downplayed the seriousness of
the rugby team's chant;" and sent out a generic email "generally discussing" UMW's efforts to
end harassment and discrimination. *Id.* at 681. But the harassment continued.
    In March 2015, after five months of complaints, UMW announced that it was suspending
all rugby activities and requiring the team to engage in sexual assault training. *Id.* at 682.
UMW's announcement caused a "flurry" of threatening and harassing social media posts
directed at Feminists United members. *Id.* When Feminists United complained about the
increase in harassment, UMW sent out a schoolwide email saying that UMW could not do
anything about cyber bullying. *Id.* at 683.
    Plaintiffs filed a complaint with the Office of Civil Rights accusing UMW of failing to
address the sexual harassment. *Id.* In response, President Hurley sent a letter to the "UMW
community" and "media outlets" stating that UMW had not received any reports of threats
against Feminists United and that Feminists United had "exaggerated" their safety concerns. *Id.*
at 684. Hurley's letter inspired additional harassment and threats towards plaintiffs. *Id.*
    The Fourth Circuit concluded that the factual allegations demonstrated deliberate
indifference sufficient to advance past the motion to dismiss stage because UMW took only

Title IX sex discrimination claim involving those college-aged students to proceed past the motion to dismiss stage based on plaintiffs' allegations.

## 2. Plaintiffs Satisfy the Four Elements of their Title VI Claim Based on Racial Discrimination

The Court will first address Plaintiffs' Title VI claim. Defendants do not contest the first two two of the four elements required to plead a Title VI racial discrimination claim: (1) that SPMS receives federal funds; and, (2) that DJ suffered harassment on account of his race. As a result, the Court considers whether Plaintiffs' allegations satisfy the remaining two prongs of a Title VI claim. They do.

The Court determines, after taking the well-pleaded factual allegations as true, that Plaintiffs have alleged that the harassment was sufficiently severe or pervasive to create a hostile environment at SPMS and on the football team, satisfying the third prong of a Title VI claim. Recounting the facts, Plaintiffs allege (1) a similar race-driven incident occurred in the locker room on October 4, approximately one week before the October 13, 2017 incident; (2) Bowers, McAuley, and SPMS administrators, knew about the incident on October 4; (3) Bowers advised DJ's parents that adult supervision would be present in the locker room following that altercation; (4) adult supervision did not occur; (5) DJ suffered from a race-driven assault and battery eight days later; (6) Bowers dismissed the attacks as foolishness and a joke; (7) a community meeting occurred where numerous participants discussed widespread racism at SPMS; (8) "McAuley confirmed that there had been previous incidents of discrimination and harassment at SPMS that, according to him, had been addressed;" and, (9) "[t]he school

---

limited steps in response to the complaints about sexually harassing and threatening comments and conduct. *Id.* at 690–91.

environment became so hostile and painful for DJ that his parents requested a waiver for him to attend another school in Henrico County where he could feel safe." (Am. Compl. ¶¶ 40, 47.)

Plaintiffs further allege that DJ was denied an educational benefit because he was assaulted, harassed, humiliated, and ultimately forced to transfer to a different school. Defendants counter that this allegation merely shows harm, not the denial of an educational benefit. (Mem. Supp. Mot. Dismiss 20.) Defendants' attempt to distinguish *Davis* because the harassment "occurred over a five-month period and involved numerous incidents," (Reply Br. 3, ECF No. 16), falls flat. When emphasizing that this "single instance" assault is insufficiently severe to be actionable, Defendants fail to acknowledge that, as alleged, the reasonable inference shows harm to DJ may continue to be present: the video might *still* be accessible on the internet. At this stage of the proceedings, the Court finds that Plaintiffs' claims that the School Board effectively barred DJ access to an educational opportunity or benefit sufficient to withstand the Motion to Dismiss because the allegations plainly show DJ had to transfer schools and that his education has significantly suffered. Therefore, Plaintiffs meet the third prong of a Title VI claim.

The allegations also satisfy the fourth prong of a Title VI claim, which requires a basis for imputing liability to the institution, because the School Board's response to the harassment may not have been reasonable. While educators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student harassment, a school does not become automatically immune to liability whenever it takes some corrective action. *Feminist Majority*, 911 F.3d at 689. Rather, the responsive steps must be "reasonably calculated to end the harassment." *Id.* Like the university administrators in *Feminist Majority* who held "listening circles" to combat harassment, Plaintiffs allege that Defendants responded with an October 25,

2017 community meeting following the October 13th incident and did not otherwise attempt to quell the pervasive harassment. While evidence may later emerge suggesting that the school's remedial actions were within the range of reasonable responses, at this early stage the Court finds that Plaintiffs have plausibly alleged that the school's response was "clearly unreasonable," such that it "cause[d]" DJ to undergo further harassment or, at the very least, remain "liable or vulnerable to it." *Davis*, 526 U.S. at 645, 648.

Plaintiffs also have pled that the School Board had notice of ongoing racial harassment prior to the October 13th incident. Plaintiffs allege that the harassment occurred in the hallways of SPMS, in plain view of teachers and other SPMS staff. Although Defendants contend that the "Plaintiffs did not allege *any* specific facts showing that the School Board was made aware of harassment directed at the Plaintiff after the October 13th Incident," (Mem. Supp. Mot. Dismiss 17), the Court takes as true Plaintiffs' well-pleaded factual allegations that the harassment was openly occurring, severe, and pervasive.[18] Therefore, Plaintiffs meet the fourth and final prong of a Title VI claim.

Taking the well-pleaded allegations in the Amended Complaint as true, as this Court must at this procedural posture, Plaintiffs have sufficiently alleged that an official with authority to address the racial discrimination at SPMS, from which DJ suffered, knew and did not adequately respond. Accordingly, Plaintiffs' Title VI Race Discrimination Claim in Count III against the School Board may advance.

---

[18] Defendants correctly articulate that Plaintiffs must prove actual knowledge of racial harassment to recover under Title VI, (Mem. Supp. Mot. Dismiss 18), and it may or may not be that Plaintiffs will not be able to set forth adequate proof of knowledge at a later stage in the proceedings.

### 3.   Plaintiffs Satisfy the Four Elements of their Title IX Claim Based on Sex Discrimination in Count IV

The Court turns now to Plaintiffs' Title IX claim. Similarly, to the Title VI claim, Defendants do not contest the first two of the four elements required to plead a Title IX sex discrimination claim: (1) that SPMS receives federal funds; and, (2) that DJ suffered harassment on account of his sex. As a result, the Court considers whether Plaintiffs' allegations satisfy the remaining two prongs of a Title IX claim. They do.

For the same reasons articulated above as to the Title VI Race Discrimination Claim, the Court concludes that the allegations in the Amended Complaint sufficiently state that the harassment was sufficiently severe or pervasive to create a hostile environment at SPMS and on the football team, that DJ suffered the denial of an educational benefit, and that there exists a basis to impute liability to the School Board. Therefore, Plaintiffs state a Title IX Sex Discrimination Claim, at least at this early stage.

To reiterate, educators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student harassment, but a school does not become automatically immune to Title IX liability whenever it takes some corrective action. *Feminist Majority*, 911 F.3d at 689. Rather, the responsive steps must be "reasonably calculated to end [the] harassment." *Id.* In *Feminist Majority*, a case involving college-aged students, the Fourth Circuit faulted the university administrators for their unreasonable response because they "merely responded with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening after particularly aggressive and targeted" threat. *Id.* Similarly, here, the record does not illuminate how Defendants responded to the pervasive harassment at SPMS apart from holding a community meeting and suggesting that adult supervision in the locker room could prevent misconduct among members of the SPMS

football team. And unlike *Feminist Majority*, where the university assigned an officer to attend organization meetings for safety concerns, the allegations at bar—which the Court must take as true—show that adult supervision of these middle school boys did not occur.

Moreover, for this Title IX claim, Plaintiffs allege that administrators had knowledge of a prior incident in the locker room involving the SPMS football team. Portions of the Amended Complaint suggest that members of the school's administration or Football coaching team tried to "minimize" or "dismiss the attacks as 'foolishness' and a 'joke'." (Am. Compl. ¶ 37.) Plaintiffs allege that harassment following the October 13th incident and video of DJ "occurred in the halls of SPMS with regularity. However, notwithstanding this open and public persecution, no action was taken by any member of the SPMS administration to address it." (*Id.* ¶ 39.) In essence, the allegations lay out a brief sequence of half-hearted measures taken by SPMS, during and after which DJ was assaulted, battered, and harassed.

In light of these allegations, the Court concludes that Plaintiffs plausibly allege that administrators were aware of severe and pervasive student-on-student sexual abuse but responded with deliberate indifference. *See Davis*, 526 U.S. at 633. At this stage, Plaintiff has plausibly alleged that the school's response was "clearly unreasonable," such that it "cause[d]" DJ to undergo further harassment or, at the very least, remain "liable or vulnerable to it." *Davis*, 526 U.S. at 645, 648. Accordingly, Plaintiffs' Title IX Sex Discrimination Claim against the School Board may advance.

**D.     Plaintiffs Fail to Allege a Vocational Rehabilitation Act Claim Against the School Board in Count V Because the Allegations in the Amended Complaint Do Not Involve DJ's Disability**

Although the Court allows Plaintiffs' claims in Counts I-IV to proceed, it will dismiss Count V. Plaintiffs allege that DJ "qualified for, and was being educated with, an Individualized

37

Education Plan . . . due to his severe attention deficit hyperactivity disorder." (Am. Compl.
¶ 11.) Plaintiffs contend DJ has a disability as defined by the Vocational Rehabilitation Act,
"because his mental impairment substantially limits his major life activities, including learning."
(*Id.* ¶ 87.) Plaintiffs allege that the School Board had actual knowledge of the student-on-student
harassment that was interfering with DJ's right to a free appropriate public education. (*Id.* ¶ 90.)

In response, Defendants aver that "[t]he Amended Complaint does not include any facts
even suggesting that [DJ's] alleged disability played any role in the alleged bullying and
harassment." (Mem. Supp. Mot. Dismiss 21.) Defendants further state that the Plaintiffs do "not
even allege that any of the students that assaulted and harassed him knew that he had an
Individual [E]ducation Plan or a disability." (*Id.*)

### 1.    Legal Standard:  Discrimination on the Basis of Disability in Violation of the Vocational Rehabilitation Act

Section 504 of the Rehabilitation Act provides in relevant part:  "No otherwise qualified
individual with a disability in the United States . . . shall, solely by reason of her or his disability,
be excluded from the participation in, be denied the benefits of, or be subjected to discrimination
under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[19]
To establish a violation of Section 504, plaintiffs must show that they have been discriminated
against—that they were "excluded from the employment or benefit due to discrimination solely
on the basis of the disability." *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265
(4th Cir. 1995).  Section 504 claims "predicated on student-on-student harassment, like their

---

[19] As the Fourth Circuit has explained, "the ADA and Rehabilitation Act . . . impose
similar requirements.  Thus, despite the different language these statutes employ, they require a
plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ.
Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012) (internal quotation marks and citations
omitted).

Title IX counterparts, require a showing of deliberate indifference on the part of the funding recipient." *S.B..*, 819 F.3d at 75.

Relevant here, in the Section 504 context, the deliberate indifference standard requires a plaintiff to show that (1) he was an individual with a disability; (2) harassed by fellow students based on his disability; (3) that the disability-based harassment was sufficiently "severe, pervasive, and objectively offensive" that it effectively deprived him of "access to educational benefits and opportunities" at school; and, (4) that the school knew about the disability-based student-on-student harassment and was deliberately indifferent to it. *Id.* at 76 (internal quotation marks and citations omitted). To that end, the Fourth Circuit has instructed "that a school may not be held liable under . . . § 504 for what its students do, but only for what is effectively an official decision by [the school] not to remedy student-on-student harassment." *Id.* at 76–77 (internal quotation marks and citations omitted). "Thus, it is not enough that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *Id.* at 77.

> **2.** **Plaintiffs Do Not Satisfy the Elements of their Rehabilitation Act Claim in Count V Because the Allegations in the Amended Complaint Do Not Show that Students Harassed DJ on Account of His Disability or that the School Board had Notice of Disability-Based Bullying**

While Plaintiffs meet the first prong of a Rehabilitation Act Claim, (they have sufficiently alleged DJ suffers from a recognized disability), their effort falters at the second prong: DJ does not allege that he suffered harassment *based* on his disability. Further, the Amended Complaint does not allege that the School Board knew or had notice of any *disability*-based bullying, the fourth prong of a disability-based claim. While the Court may draw inferences from the facts as alleged in the Amended Complaint regarding Defendants' knowledge of race-based or sex-based bullying, the allegations fall short on saying DJ's

disability contributed to the harassment or discrimination that he suffered at SPMS. Therefore, the Court will dismiss the Rehabilitation Act Claim in Count V.

Plaintiffs contend that simply because some of their "allegations may not relate to [DJ's] disability" does not mean this claim fails. (Resp. Mot. Dismiss 23.) But unlike the Title VI race and Title IX sex discrimination claims, Plaintiffs do not plead that the October 13th incident or harassment suffered thereafter related to DJ's disability. Similarly, Plaintiffs do not allege that the School Board had notice of pervasive disability-based bullying at SPMS or in the locker room. Although Plaintiffs state that "[d]epositions of the students who assaulted DJ, as well as other information gleaned through discovery, will help to further elucidate the exact motivation, or motivations, behind the attacks on DJ," (*id.* 24), individual student motivations will not speak to what the *School Board* knew about disability-based bullying. Plaintiffs' allegations, therefore, fall short. Accordingly, the Court will grant Defendants' Motion to Dismiss as to the Rehabilitation Act Claim against the School Board in Count V.

E.     **Because Plaintiffs' Allegations Meet the Elements of a Gross Negligence and Willful Negligence Claim, Plaintiffs Adequately Allege these State Law Tort Claims Against McAuley, Bowers, and John Does 1–3 in Counts VI and VII**

The Court now addresses Plaintiffs' final two claims in Counts VI and VII: gross negligence and willful negligence. Both claims survive the Motion to Dismiss because whether a duty of care exists in this case may turn on the factual circumstances.

Plaintiffs contend that McAuley, Bowers, and John Does 1–3 acted with gross negligence when they breached their duty of reasonable care by leaving the SPMS football players unsupervised in the boys' locker room for an extended period of time despite knowledge of harassment in the locker room and assurances that the players would no longer be left alone in the locker room without adult supervisions. Plaintiffs suggest that the "several acts of

40

negligence of *each* of the Defendants *individually* (as opposed to the group as a whole), when combined, had a cumulative effect showing a reckless or total disregard of DJ." (Am. Compl. ¶ 105.)

Plaintiffs further contend that McAuley, Bowers, and John Does 1–3 acted with willful and wanton negligence because they were aware of harassment and bullying on the basis of race and sex occurring in the locker room for the SPMS football team, and despite assurances of action, DJ and other players on the team suffered assault and battery on October 13, 2017. (Am. Compl. ¶¶ 94–105.) Plaintiffs aver McAuley, Bowers, and John Does 1–3 were willfully and wantonly negligent in that they acted, or failed to act, in disregard of DJ's rights. (*Id.* ¶ 119.)

Defendants argue that the Court should dismiss the tort claims because Plaintiffs have "failed to identify a legal duty under Virginia law," meaning that Defendants cannot be held liability for negligence. (Mem. Supp. Mot. Dismiss 22.)

### 1.    Legal Standard:  Gross Negligence

Virginia recognizes three degrees of negligence: (1) simple or ordinary negligence; (2) gross negligence; and (3) willful or wanton negligence. *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004).[20]  To prove gross negligence under Virginia law, the

---

[20] As the Supreme Court of Virginia has explained,

> The first level, simple negligence, involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another.  The second level, gross negligence, is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.  This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.

> The third level of negligent conduct is willful and wanton negligence.  This conduct is defined as acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his

plaintiff must show the basic elements of negligence: "a legal duty, a violation of the duty, and a consequent injury." *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). "The finding of a legal duty is a prerequisite to a finding of negligence." *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (internal citations omitted). "Without a legal duty there can be no cause of action for an injury." *Id.*

In most circumstances, the question of whether a duty in tort exists presents a "question of law." *Volpe v. City of Lexington*, 708 S.E.2d 824, 827 (Va. 2011).[21] Virginia courts recognize that "[a]s a general rule, there is no duty to warn or protect against acts of criminal assault by third parties. This is so because under ordinary circumstances, acts of assaultive criminal behavior by third persons cannot reasonably be foreseen." *Terry v. Irish Fleet, Inc.*, 818 S.E.2d 788, 792 (Va. 2018) (internal quotation marks and citation omitted). "Indeed, in only rare circumstances has this Court determined that the duty to protect against harm from third party criminal acts exists."[22] *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 468 (Va. 2019) (internal quotation marks and citations omitted).

---

knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Cowan*, 603 S.E.2d at 918–19 (internal quotation marks and citations omitted).

[21] "[T]he imposition of a duty is nothing more than a threshold requirement that if satisfied, merely opens the courthouse doors." *RGR, LLC v. Settle*, 764 S.E.2d 8, 20 (Va. 2014) (internal citations omitted). Once a court determines that a duty exists, the jury weighs the evidence and determines whether the duty has been performed. *See id.* at 20.

[22] In *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, the Virginia Supreme Court expounded on the duty to warn or protect in a footnote, collecting cases and stating that the two duties are often referred to without distinction but

the overarching duty is to exercise reasonable care. *See generally* William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 56, at 385 (Dan B. Dobbs et al. eds., 5th ed. 1984) ("In all such cases where the duty does exist, the obligation is not an absolute one to insure the plaintiff's safety, but

But the fact that circumstances are rare incorporates the notion that exceptions exist.  The Virginia Supreme Court has explained, for instance, that "when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care." *Burns v. Gagnon*, 727 S.E.2d 634, 643 (Va. 2012) (internal quotation marks and citation omitted).  While the supervising adult "is not an insurer of the child's safety. . . . the supervising adult must discharge his or her duties as a reasonably prudent person would under similar circumstances." *Id.* (internal quotation marks and citation omitted).  Because a school has an obligation to adequately supervise the activities of students within its charge and may be held liable for a foreseeable injury proximately related to the absence of such supervision, whether a duty of care exists may turn on the factual circumstances of the case. *Burns*, 727 S.E.2d at 643–44.

Virginia courts also recognize the common-law principle of assumption of a duty. *Burns*, 727 S.E. 2d at 643.  Under that principle, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Kellermann v. McDonough*, 684 S.E.2d 786, 791 (Va. 2009) (internal quotations and citations omitted). "[W]hether a defendant owes a plaintiff a duty in tort is generally a question of law.  But when the issue is not whether the law recognizes a duty, but rather whether the defendant by his [or

---

requires only that the defendant exercise reasonable care.  There is thus no liability when such care has in fact been used, nor where the defendant neither knows nor has reason to foresee the danger or otherwise to know that precautions are called for." (footnotes omitted)).  Sometimes a warning may be enough to satisfy the standard of reasonable care, while other times it may not.  When reasonable individuals could disagree on whether a warning alone was sufficient to mitigate the risk or whether stronger protective measures were warranted, the question belongs solely to the finder of fact.

831 S.E.2d 460, 468 n. 5 (citations omitted).

her] conduct *assumed* a duty, the existence of that duty is a question for the fact-finder." *Burns*,
727 S.E. 2d at 643 (emphasis added).

Should a duty exist, Virginia law defines gross negligence as "the utter disregard of
prudence amounting to complete neglect of the safety of another.  It is a heedless and palpable
violation of legal duty respecting the rights of others which amounts to the absence of slight
diligence, or the want of even scant care." *Volpe*, 708 S.E.2d at 828 (internal citations and
quotations omitted).  "Because the standard for gross negligence [in Virginia] is one of
indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the
evidence shows that the defendants exercised some degree of care." *Fijalkowski v. Wheeler*, 361
F. Supp. 3d 577, 593 (E.D. Va. 2019) (internal citations and quotations omitted).

Still, "[s]everal acts of negligence which separately may not amount to gross negligence,
when combined may have a cumulative effect showing a form of reckless or total disregard for
another's safety." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (internal quotation marks
and citation omitted).  "Ordinarily, the question whether gross negligence has been established is
a matter of fact to be decided by a jury." *Id.*

### 2.     Legal Standard:  Willful and Wanton Negligence

In Virginia, "[w]illful and wanton negligence is action taken in conscious disregard of
another's rights, or with reckless indifference to consequences that the defendant is aware, from
his knowledge of existing circumstances and conditions, would probably result from his conduct
and cause injury to another." *Kaltman v. All American Pest Control, Inc*., 706 S.E.2d 864, 871
(Va. 2011) (internal quotation marks and citation omitted).

"Willful or wanton negligence involves a greater degree of negligence than gross
negligence," in that an essential ingredient of the act or omission in willful or wanton negligence

is an actual or constructive consciousness of the danger involved. *Boward v. Leftwich*, 89 S.E.2d 32, 35 (Va. 1955). "'An actor guilty of willful and wanton conduct intends his act, but not the resulting harm.'" *Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005) (quoting *Infant C. v. Boy Scouts of America, Inc.*, 391 S.E.2d 322, 328 (Va. 1990)). "Whether an action rises to a level deemed willful or wanton is largely a fact-specific inquiry, and each defendant's actions or omissions must be individually evaluated." *Runnels v. Norcold, Inc.*, No. 1:16-CV-713, 2017 WL 1130068, at \*5 (E.D. Va. Mar. 24, 2017), *aff'd sub nom. Colbert v. Norcold, Inc.*, 726 F. App'x 956 (4th Cir. 2018) (internal quotation marks and citations omitted).

      **3.**    **Inferring on this Limited Record that McAuley, Bowers, and John Does 1-3 Owed a Duty to the SPMS Football Team and DJ, Plaintiffs' Allegations Satisfy the Elements for a Gross Negligence and Willful Negligence Claim in Counts VI and VII**

      Because the Court may infer based on the well-pleaded allegations that McAuley, Bowers, and John Does 1–3 may have owed DJ a duty and may have breached that duty, Plaintiffs satisfy the elements required for pleading a gross negligence and willful and wanton negligence claim as requireed to withstand the Motion to Dismiss.

      The Court first finds that at this procedural posture, McAuley, Bowers, and John Does 1–3 owed a duty to DJ based on the facts alleged and drawing all reasonable inferences in favor of Plaintiffs. Because Plaintiffs have sufficiently alleged that McAuley and Bowers had either a common-law duty to supervise and care for DJ or voluntarily assumed a duty to provide adult supervision for the middle school locker room, the Court must consider whether the allegations would shock fair-minded persons to establish a claim of gross negligence or acted in conscious disregard of DJ's rights to state a claim of willful and wanton negligence.

      Here, reasonable minds could differ about whether McAuley and Bowers's actions or inactions, as alleged in the Amended Complaint, constituted gross or willful and wanton

negligence. The allegations indicate McAuley and Bowers had knowledge about harassment in the SPMS locker room and that their actions (ensuring adult supervision) in the locker room could prevent similar incidents. In the Amended Complaint, Plaintiffs describe a community meeting that occurred on October 25, 2017, "at which the widespread nature of the discrimination and harassment at SPMS, and the knowledge of McAuley and the Board of this fact, was discussed at length." (Am. Compl. ¶ 44.)

Additionally, as Plaintiffs contend, "reasonable minds could easily find that the Defendants had prior knowledge based on *both* a specific warning (conveyed to them by DJ's father) and their specialized training as school administrators." (Resp Mot. Dismiss. 28.) (emphasis in original). Plaintiffs further emphasize that this case involves "trained educators with the responsibility for supervising hundreds of children failing to fulfill a basic duty to protect them." (*Id.*) Additionally, Plaintiffs claim that "the simplicity of the solution available to Defendants (i.e., locker room supervision) . . . could have avoided . . . immense and long-lasting harm through a simple administrative act." (*Id.* 29.) Plaintiffs posit that the failure to employ such a simple solution to prevent foreseeable harm could "shock fair minded [people.]" (*Id.*)

Tort cases often involve fact-specific inquiries that are better resolved on a more developed record. Indeed, many cases involving similar claims of harassment in a school setting advance past the pleadings stage. *See, e.g.*, *Deshaney*, 489 U.S. 189 (summary judgment); *Feminist Majority*, 911 F.3d 674 (advancing past motion to dismiss stage); *Rosa*, 795 F.3d 429 (summary judgment); *S.B.*, 819 F.3d 69 (summary judgment); *Baynard*, 268 F.3d 228 (judgment as a matter of law after jury verdict); *Jennings*, 482 F.3d 686 (summary judgment); *Pinder*, 54 F.3d 1169 (summary judgment). The Court also recognizes that "where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct

exception." *Waybright*, 528 F.3d at 205 (stating that due process claims that overlap tort claims raise a rebuttable presumption that may be overcome by showing governmental conduct so "arbitrary" and "egregious" that it "shocks the conscience"). Because Plaintiffs have not yet engaged in discovery and had the chance to develop their claims factually, the Court declines to dismiss these tort claims now. Accordingly, the Court will deny the Motion to Dismiss as to the Gross Negligence and Willful and Wanton Negligence Claims against McAuley, Bowers, and John Does 1-3 in Counts VI and VII.

### IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Motion to Dismiss, (ECF No. 13). Specifically, the Court will dismiss Count V, but will allow all other claims to proceed. The Court will order Defendants to file responses to the Amended Complaint in accordance with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Eastern District of Virginia.

An appropriate order shall issue.

                                        /s/

                                  M. Hannah Lauck
                                  United States District Judge

Date: Sept. 18, 2020
Richmond, Virginia